RURAL EDUCATIONAL ASSOCIATION, Plaintiff-in-Error-Defendant, v. STEWART C. BUSH, Defendant-in-Error-Plaintiff.—298 S. W. (2d) 761.

Middle Section. November 30, 1956.

Petition for Certiorari denied by Supreme Court, February 8, 1957.

36 

George H. Armistead, Jr., Chas. L. Cornelius, Jr., Nashville, for plaintiff in error.

Dan E. McGugin, Watkins, McGugin & Stewart, Nashville, for defendant in error.

HICKERSON, J. Stewart C. Bush brought this suit against Rural Educational Association to recover damages for injuries which he received as a result of an operation performed upon him in Madison Sanitarium and Hospital, which is privately owned and operated by defendant.

Specifically, plaintiff charged that:

"A large surgical sponge or other large object was negligently and carelessly left in plaintiff's intestines which was wholly unknown to him as he was unconscious at the time under the effects of an anesthetic. As a result, plaintiff was sewed up and dismissed from the hospital with this sponge or object in his intestines."

Defendant pleaded the general issue of not guilty.

Judgment was entered in favor of plaintiff, upon a jury verdict, in the sum of $15,000.

Four questions are made by the assignments:

1. Did the Court err in refusing to direct a verdict for defendant?

2. Did the Court err, "in sustaining an objection to evidence offered by the defendant for the purpose of showing that the sum of $10,000.00 was paid to the plaintiff on behalf of the surgeon who had operated on the plaintiff for a covenant not to sue for damages arising

out of the alleged injury the plaintiff was complaining of and for which he was seeking damages''?

3. Did the Court err in the charge to the jury?

4. Was the verdict excessive?

(1) In Pool v. First National Bank of Smyrna, 29 Tenn. App. 327, 196 S. W. (2d) 563, 567, this Court said:

"The rule for determining a motion for a directed verdict has often been stated in numerous cases. It has been fashioned to preserve the constitutional right of trial by jury and to administer the common law separation of function by which the jury try the fact and the judge the law. It requires the trial judge, and the appellate court on review, to look to all the evidence, to take the strongest legitimate view of it in favor of the opponent of the motion, to allow all reasonable inferences from it in his favor, to discard all countervailing evidence; and if then there is any dispute as to any material determinative evidence, or any doubt as to the conclusion to be drawn from the whole evidence, the motion must be denied. Wildman Mfg. Co. v. Davenport Hosiery Mills, supra [147 Tenn. 551, 249 S. W. 984]; Brenizer v. Nashville C. & St. L. Ry., 156 Tenn. 479, 3 S. W. (2d) 1053, 8 S. W. (2d) 1099; Provident Life & Acc. Ins. Co. v. Prieto, 169 Tenn. 124, 83 S. W. (2d) 251; Osborn et al. v. City of Nashville, 182 Tenn. 197, 185 S. W. (2d) 510; Patillo v. Gambill et ux., 22 Tenn. App. 485, 492, 124 S. W. (2d) 272, 276; Tennessee Cent. Ry. Co. v. McCowan, Tenn. App. 188 S. W. (2d) 931.''

The jury returned a general verdict. The effect of such verdict in the case on trial was to decide each

issue in favor of plaintiff if there was material evidence to support such verdict. Code Section 10343; Summers v. Bond-Chadwell Co., 24 Tenn. App. 357, 145 S. W. (2d) 7; Stewart v. Parker, 33 Tenn. App. 316, 232 S. W. (2d) 57.

Applying these rules, there is material evidence in the record to support a finding by the jury of the following facts: Defendant operated a hospital in Davidson County, Tennessee, known as Madison Sanitarium and Hospital. Plaintiff was admitted to this hospital on May 11, 1954, for examination and treatment. He had no personal private physician to attend him at the hospital; so, he was referred by the hospital to Dr. J. C. Gant, who was Medical Director of the Hospital. Plaintiff was a "pay patient" at the hospital. He had insurance which paid a substantial part of his bill at the Hospital and the doctors' bill incident to his illness.

Several physicians were on the "resident staff" of the Hospital. These physicians had offices in the hospital buildings and rendered the necessary medical and surgical services to the patients who had no private physician to wait on them in the Hospital. Among these members of the resident staff were Dr. J. C. Gant, the Medical Director; Dr. G. E. Horsley, who was an eye, ear, and nose specialist; and Dr. James D. Schuler, a surgeon. Plaintiff did not know any of these physicians when he entered the Hospital.

Plaintiff was first examined by Dr. Gant, who then referred him to Dr. Horsley. After the examination by Dr. Horsley, Dr. Gant turned plaintiff over to Dr. Schuler. Plaintiff did not select these doctors as his private physicians. To the contrary, he submitted him-

self to the Hospital and its staff for hospitalization, examination, diagnosis and treatment; and, as stated, he was sent by Dr. Gant from one doctor to another on the Hospital resident staff until the examination was completed.

Dr. Gant then told plaintiff the result of the examinations. These doctors found plaintiff had mastoiditis, and an operation was recommended. Plaintiff accepted the recommendation, and Dr. Horsley operated on him for mastoid trouble.

After plaintiff had recovered from the mastoid operation, Dr. Gant and Dr. Schuler recommended that he have an abdominal operation. He agreed to that and Dr. Schuler performed the operation.

These operations took place in the surgery rooms of defendant. All facilities and all personnel were furnished by defendant. The nurse and anesthetist were among the attendants. They were the servants and employees of defendant and were paid by defendant for their services in connection with these operations.

The nurse of defendant prepared the surgery rooms for the operations. In connection with the abdominal operation on plaintiff, which was performed by Dr. Schuler, the nurse of defendant placed in the surgery room certain sponges which were necessary for use during that operation. The approved and commonly used type of sponge for such operations has a long tape fastened to the sponge at one end of the tape with a safety ring at the other end of the tape. This tape and ring hang outside the incision as a safety measure or precaution against the possibility of leaving the sponge in the abdomen of the patient after the operation has

been completed. When this type of tape is used, it is impossible to close the incision and leave the sponge in the body for the tape and ring would be hanging on the outside of the incision. The nurse of defendant who prepared for the operation did not provide this type of sponge. She merely provided and used sponges with no safety tape and no ring attached.

It is the custom and practice that the operating surgeon is in complete charge of the surgery room and all personnel connected with the operation. In matters of professional skill or decision, it is the duty of the personnel (nurses, the anesthetists, or any others who may assist) to obey explicitly the orders of the surgeon. There are many matters, however, which do not involve professional skill or decision on the part of the surgeon. It is the custom and practice for the nurses to count the sponges which are taken into the surgery room. After the operation, and before the incision is closed, the nurses again count the sponges which have not been used, then count the sponges which have been used, and see if they total the number originally brought into the surgery room. As a double check, two nurses are furnished: the scrub nurse, or surgery nurse; and the "circulating" nurse. On the sponge count the scrub nurse first makes the count, then the circulating nurse counts the sponges to see if the two nurses agree in their count.

The surgeon relies upon the nurses for this sponge count. Before closing the incision, the surgeon inquires of the nurses about the sponge count. If they assure him the sponge count is correct, he closes the incision.

In the case on trial, Dr. Schuler made such inquiry about the sponges and was informed by the scrub nurse

that the sponges were accounted for. Whereupon, the surgeon closed the incision. The nurse, however, made a mistake. No circulating nurse had been provided for this operation, although a circulating nurse was required and commonly used. The sponges had not been correctly counted. One large, long sponge was left in the abdomen of plaintiff and lodged in one of his intestines.

The abdominal operation was performed on November 18, 1954. Plaintiff did not recover from this operation as expected. He finally became desperately sick and was returned to the hospital on February 25, 1955, and Dr. Schuler again did an abdominal operation on plaintiff. This last operation disclosed a gangrenous intestine caused by this sponge in it. The surgeon had to remove about three feet of the intestine. After cutting the intestine open, he found the sponge in it. Dr. Schuler stated:

"Q. And then what did you do with the specimen?

"A. Well, I cut the bowel open to see what it looked like inside and to my utter confusion and embarrassment this sponge was found.

"Q. What type of sponge was it, Dr. Schuler?

"A. Well, the sponge is what we call a lap sponge, one that was undoubtedly used as a lap pack for the intestine in the first operation."

With commendable frankness, Dr. Schuler told the family about the mistake which had been made, and made no charge for this last operation. We might add, also, that the abdominal operation performed by Dr. Schuler was an excellent and skillful piece of professional work by him, except leaving the sponge in the body.

That this state of facts constitutes negligence cannot be doubted. The question before this Court is whether defendant can be held liable for the negligence; or, more specifically, is there material evidence in the record to support a finding by the jury that defendant is liable for such negligence?

If there is material evidence in the record to support a finding by the jury that Dr. Schuler was an agent of defendant at the time he performed the operation, defendant is liable in damages to plaintiff for leaving the sponge in his body. Dr. Schuler testified he was an independent surgeon, and that plaintiff was his private patient. Against that testimony, we have the facts and circumstances stated above.

■ Agency may be proved by circumstances and by evidence of the conduct of the parties. Hammond v. Herbert Hood Company, 31 Tenn. App. 683, 221 S. W. (2d) 98.

■ What agent did with knowledge and approval of his principal is circumstantial evidence of what agent was authorized to do. Boillin-Harrison Company v. Lewis & Company, 182 Tenn. 342, 187 S. W. (2d) 17.

■ Burden of proof is on person attempting to establish an agency, that alleged agent was in fact the agent of the alleged principal and was authorized to do the act done. Cobble v. Langford, 190 Tenn. 385, 230 S. W. (2d) 194.

■ Whether an agency has been created is to be determined by the relations of the parties as the relations in fact exist under their agreements or acts, whether the parties understand that there is an agency or not. Smith

v. Tennessee Coach Company, 183 Tenn. 676, 194 S. W. (2d) 867.

A principal is bound if an agent acts within his apparent or ostensible authority. McCoy v. Willis, 177 Tenn. 36, 145 S. W. (2d) 1020.

Our Supreme Court approved this statement of the rule of "Apparent or Ostensible Authority," Southern Railway Company v. Pickle, 138 Tenn. 238, 197 S. W. 675, 677:

"Apparent authority in an agent is such authority as the principal knowingly permits the agent to assume or which he holds the agent out as possessing; such authority as he appears to have by reason of the actual authority which he has; such authority as a reasonably prudent man, using diligence and discretion, in view of the principal's conduct, would naturally suppose the agent to possess. Ostensible authority is such authority as a principal intentionally or by want of ordinary care causes or allows a third person to believe the agent to possess, and in some jurisdictions it is so defined by statute. Ostensible authority to act as agent may be conferred if the principal affirmatively or intentionally, or by lack of ordinary care, causes or allows third persons to act on an apparent agency. It is essential to the application of the above general rule that two important facts be clearly established: (1) That the principal held the agent out to the public as possessing sufficient authority to embrace the particular act in question, or knowingly permitted him to act as having such authority; and (2) that the person dealing with the agent knew of the facts, and,

acting in good faith, had reason to believe, and did believe, that the agent possessed the necessary authority.''

■ These resident staff members of Madison Sanitarium and Hospital practice medicine under an association or partnership styled, Madison Associated Physicians. Wherefore, we have this situation: the defendant corporation owned and operated Madison Sanitarium and Hospital. The resident medical staff of the hospital operated under the name of Madison Associated Physicians with offices in the hospital, and they actually did the medical and surgical work for patients at the hospital. Dr. J. C. Gant was the Chief, or Medical Director, of the hospital. He, Dr. Morsley and Dr. Schuler were members of Madison Associated Physicians. Now, when plaintiff came to the hospital, he announced he wanted to enter the hospital for examination and treatment. He was referred to Dr. J. C. Gant, the Medical Director, who examined him and then had him examined by the specialists on the resident staff. Plaintiff did not know any of these doctors. He thought of them as the Madison Sanitarium and Hospital Doctors, and we think very reasonably so.

Was defendant liable for the acts of its nurses if Dr. Schuler was not the agent of defendant when he performed the operation in question?

■ When a nurse acts under the orders of a private physician in matters involving professional skill and decision, she is absolved from liability for her acts. Many acts of a nurse, however, do not result from orders of the' physician. Furnishing proper personnel and equipment for an operation are duties of a hospital. The selection of proper sponges was the duty of the Hospital. Count-

ing the sponges so as to see that no sponge was left in the body of the patient required no special professional skill or decision of the surgeon. Indeed, Dr. Schuler relied upon the sponge count of the nurse.

In these matters we hold the jury were justified in reaching a factual conclusion that the nurse was the agent of the defendant.

The same defenses that are made in the case on trial were made by the same defendant in Rural Education Association, Inc., v. Anderson, 37 Tenn. App. 209, 261 S. W. (2d) 151, 155, where this Court said:

"Defendant claims that its witness Dr. Gant made out a complete defense for it, and it was entitled to a directed verdict on his testimony.

"Dr. Gant said he was acting, not as defendant's medical director, but as the patient's physician; that the nurses called him for instructions how to handle the patient; that he found the patient rational and sitting quietly on the bed; and that he considered two things; whether to remove the patient from the surgical to the medical wing, or to tie him in bed, and reached a 'medical decision' not to do either.

"Defendant contends that this was a matter involving expert knowledge and professional skill; that this judgment thereon by Dr. Gant, as attending physician, even though erroneous, was final and conclusive; and that defendant's nurses and attendants could not be found negligent for following this medical decision of the patient's physician.

"This testimony cannot excuse defendant. By all the other proof the patient was so 'irrational' that

the nurses 'couldn't handle him,' and it was 'obvious' that he needed a special attendant. It is a matter of common knowledge and common sense of laymen that a patient in such a condition should be watched and protected and not left unattended on an upper story by an unguarded window through which he might, and ultimately did, fall or jump to his death.

"A similar excuse, based on instructions of the patient's physician, was rejected in the leading case of Wetzel v. Omaha Maternity and General Hospital, supra [96 Neb. 636, 148 N. W. 582]. It was there said: 'Duties which a hospital as such owes to a patient cannot be evaded by proof that the hospital nurse obeyed the instructions of the physician employed by him. Nurses necessarily have charge of delirious patients during the absence of physicians, while the responsibility of the hospital continues.' 148 N. W. 582, 583, Ann. Cas. 1915B, 1226.''

Returning to the original question: Was material evidence introduced to support a finding by the jury that defendant was guilty of actionable negligence in connection with the operation which Dr. Schuler performed upon plaintiff?

Professional or expert testimony was not necessary to establish that leaving the sponge in plaintiff's body was negligence. Any layman would know that fact. Since we have held that there was evidence to support a finding by the jury that the nurse and Dr. Schuler were agents of defendant in connection with this operation on plaintiff, defendant cannot escape liability for their negligent acts. Poor Sisters of St. Francis v. Long, 190 Tenn. 434, 230 S. W. (2d) 659; Rural Education

Association, Inc., v. Anderson, 37 Tenn. App. 209, 261 S. W. (2d) 151; Spivey v. St. Thomas Hospital, 31 Tenn. App. 12, 211 S. W. (2d) 450; Sepaugh v. Methodist Hospital, 30 Tenn. App. 25, 202 S. W. (2d) 985.

(2) Defendant complains that the trial judge refused to allow it to prove that Dr. Schuler paid plaintiff $10,000 for a covenant not to sue in connection with this operation.

Defendant states in its brief:

"We also feel that the Court erred in sustaining the plaintiff's objection to the evidence offered by the defendant for the purpose of showing that the sum of $10,000.00 was paid the plaintiff on behalf of the surgeon for a covenant not to sue for damages arising out of the injury herein complained of. We appreciate the fact that one joint tort feasor cannot get the benefit of a covenant not to sue issued to the other tort feasor, but in this case Mrs. Bush had positively testified that nothing had been paid by the surgeon in connection with any claim made by Mr. Bush against him. Certainly the evidence of Mr. Moody an insurance adjuster who paid the $10,000.00 to Mr. Bush for the covenant not to sue, was competent evidence to impeach or contradict the testimony of Mrs. Bush. That was the purpose of the defendants in offering the evidence of Mr. Moody concerning the covenant not to sue."

We find no factual basis in the record to support this assignment. The record shows that Dr. Schuler sent his Attorney to see plaintiff about "buying his peace." Plaintiff had made no claim against Dr. Schuler. The negotiations leading to the covenant not to sue were

initiated by Dr. Schuler, not plaintiff. Mrs. Bush did not testify that nothing had been paid by the surgeon in connection with a claim made by plaintiff against Dr. Schuler. There is no merit in the question made by defendant in the second assignment of error.

(3) We quote the third assignment of error:

"The Court erred in charging the jury on the one hand that it was a question for them to determine whether Dr. Schuler was the agent or servant of the defendants and acting within the scope of his employment when he performed the operation, and on the other hand, at the same time charging that the surgeon has complete and final control as to the operation. The following two excerpts quoted from the charge show such inconsistence:

" '* * * it is an issue for your determination, what was the relationship of the parties, of Dr. Schuler and the hospital and the defendant * *

" 'Now, lady and gentlemen of the jury, in this case it is for you to weigh all the evidence and determine whether Dr. Schuler was *at the time of this operation* on November 18, 1954, the agent or servant of the defendants and was acting within the scope of his employment or authority when he performed the operation, as insisted by the plaintiff, or *whether* Dr. Schuler was self-employed and was engaged by Mr. Bush personally as a surgeon to do the operation * * * (italics supplied).

* * * * * *

" '* * * Thus, while the surgeon has complete and final control as to the operation, and it may be assumed that he knows what to do and will while the

operation is underway conduct it with due care and caution, this does not mean that the operators of the hospital, acting through their agents and servants, are relieved from their duty to do what ordinarily careful persons engaged in the 'same business would do and actually check on details and, if necessary, call the attention of the surgeon to matters which, by their skill and training and by the exercise of ordinary care, they know are customarily reported upon under ordinary operating standards.' "

There is no inconsistency in the charge. A corporation can only act through its agents or servants. An agent or servant may have complete charge of the actual work being done, but the corporation is liable for the negligence of its agent or servant in doing the work. Furthermore, the principal or corporation will, also, be liable for the negligent acts of its other agents or servants who assist the agent in charge and control of the particular work being done.

The determinative questions are whether or not Dr. Schuler was the agent of defendant when he performed the operation on plaintiff; and whether or not the nurse assisting in the operation was the agent of defendant in connection with this operation when she committed the negligent acts set out above. The jury resolved these issues against defendant upon material evidence to support the verdict. There is no merit in the assignment on the charge.

(4) Was the verdict excessive?

The sponge in the intestine caused it to become gangrenous. Plaintiff suffered terrible pain for several months. He was forced to have a serious operation, the

third within one year. Three feet of his intestine were removed. He was unconscious for seven or eight days. He was in great danger of losing his life. He was desperately sick.

The rules relating to the amount of the recovery in personal injury cases are well known. They are stated in Thoni v. Hayborn, 37 Tenn. App. 56, 260 S. W. (2d) 376; Wesco Paving Company v. Nash, 35 Tenn. App. 409, 245 S. W. (2d) 782; Foster & Creighton Company v. Hale, 32 Tenn. App. 208, 222 S. W. (2d) 222.

■ The damages awarded were small enough for the injuries which plaintiff sustained.

There is no error in the judgment of the Circuit Court. Let the assignments be overruled and the judgment be affirmed with interest and all costs.

Felts and Shriver, JJ., concur.