William A. CRUMLEY, etc., Plaintiff,

v.

MEMORIAL HOSPITAL, INC.,
Defendant.

No. CIV–2–77–46.

United States District Court,
E. D. Tennessee,
Northeastern Division.

Dec. 22, 1978.

On Motion For Involuntary Dismissal
April 24, 1979.

Howell H. Sherrod, Jr., Johnson City, Tenn., for plaintiff.

Walter L. Price, Johnson City, Tenn., for defendant.

## MEMORANDUM OPINION AND ORDER

NEESE, District Judge.

This is an action for the recovery of damages for wrongful death arising from medical malpractice. 28 U.S.C. § 1332(a)(1), (c). The plaintiff moved for a summary judgment,[1] Rule 56, Federal Rules of Civil Procedure, on the issue that " * * * the administration of anesthesia by Dr. Oswald Berrios on April 2, 1974, was a proximate cause of the death of [her decedent]. * * * " That motion lacks merit.

 In support of her motion, the plaintiff relied on the answer by a question posed by Dr. Henry Price at the taking of his deposition. Such physician, apparently after having reviewed certain medical records provided him, stated his conclusory opinion that the cause of the death of the plaintiff's decedent was his suffering " * * * a cardiac arrest caused by hypoxia, which was caused by the improper administration of anesthesia. * * * " Assuming *arguendo* that Dr. Price is a competent witness herein,[2] summary judgment is still not appropriate.

1. What the plaintiff seeks by such motion actually is a partial summary adjudication of this single factual issue under Rule 56(d), Federal Rules of Civil Procedure.

2. The defendant contends that the Court cannot consider Dr. Price's deposition, because he is not a competent witness. Of course, evidentiary materials submitted in support of a motion for summary judgment must relate to information which would be admissible at trial. 10 Wright & Miller, Federal Practice and Procedure: Civil 684, § 2738. The Court's jurisdiction herein having been invoked because of the diverse citizenship of the parties and the requisite amount in controversy, 28 U.S.C. § 1332(a)(1), (c), the substantive law of Tennessee forms the rules of decision herein. *General*

Insurance Co. of America v. Lowry, C.A. 6th (1978), 570 F.2d 120, 121[1]; 28 U.S.C. § 1962.

Furthermore, the competency of Dr. Price as a witness is to be determined in accordance with Tennessee law. Rule 601, Federal Rules of Evidence. This state has provided by statute that, in a medical malpractice action, a person is incompetent to testify as to certain matters which the plaintiff must prove " * * * unless he was licensed to practice in the state or a contiguous bordering state a profession or specialty which would make his expert testimony relevant to the issues in the case and has practiced this profession or specialty in one of these states during the year preceding the date that the alleged injury or wrongful act occurred. * * * " T.C.A. § 23-3414(b).

As a general rule, opinion testimony is not an appropriate basis for the granting of a motion made under Rule 56, *supra*. *Sartor v. Arkansas Nat. Gas Corp.* (1944), 321 U.S. 620, 627, 64 S.Ct. 724, 728, 88 L.Ed. 967, 972; *Hughes v. American Jawa, Ltd.*, C.A. 8th (1976), 529 F.2d 21, 25[2]; *Elliott v. Massachusetts Mut. Life Ins. Co.*, C.A. 5th (1968), 388 F.2d 362, 365[3]; *Kern v. Tri-State Ins. Co.*, C.A. 8th (1967), 386 F.2d 754, 756[2, 3]. This is so, because the opinion of an expert witness is not conclusive and any weight and effect to be given such evidence, if admitted, is a function for the trier(s)-of-the-facts. *Sartor v. Arkansas Nat. Gas Corp., supra*, 321 U.S. at 627–628, 64 S.Ct. at 728–29, 88 L.Ed. at 972–973. Thus, the deposition testimony of Dr. Price " * * * is merely an expression of opinion and does not negate the existence of an issue of fact on a motion for summary judgment. * * * " *Gillentine v. McKeand*, C.A. 1st (1970), 426 F.2d 717, 722[11].

The Court recognizes that there are exceptions to this general rule, and that, in certain cases where expert testimony must be presented on an issue of fact, summary judgment may be appropriate on the opinion of an expert. 10 Wright & Miller, *supra*, at 692–694, § 2738. Here, however, the issue of proximate causation is interwoven with the issue of negligence.

In this circuit, negligence cases " * * * are ordinarily not susceptible of summary adjudication, but should be resolved by trial in the ordinary manner. * * * " *Rogers v. Peabody Coal Company*, C.A. 6th (1965), 342 F.2d 749, 751[5, 6]; *accord: McTavish v. Chesapeake and Ohio Railroad Co.*, C.A. 6th (1973), 485 F.2d 510, 513[4]. Under the circumstances presented, " * * * a full inquiry into the facts under usual trial procedure is advisable. * * * " *S. J. Groves & Sons Company v. Ohio Turnpike Commission*, C.A. 6th (1963), 315 F.2d 235, 237–238[1].

It is undisputed that Dr. Price did not meet the aforementioned licensing requirements at ·the pertinent time, since he was licensed only in the states of Maryland and Pennsylvania. Accordingly, he would not, under the aforementioned general provision, be competent as a witness herein. However, it has been provided

For such reason, the motion of the plaintiff for a summary judgment hereby is

OVERRULED.

Although the Court would like to accommodate counsel in their preparation for trial, by determining pretrial the competency of Dr. Price as a witness herein, it is unable to do so. The affidavit of counsel for the plaintiff indicates that there is a possibility that he may have available as a trial witness an unnamed anesthesiologist from Knoxville, Tennessee. Thus, as of now, it does not appear that, without Dr. Price, " * * * the appropriate witnesses otherwise would not be available. * * * " T.C.A. § 23–3414(b). The Court is of the opinion tentatively, however, that the waiver provision of the aforementioned statute should be applied liberally in a situation where a plaintiff is unable, after exercising reasonable diligence, to obtain expert witnesses to testify *in her favor* except by going outside Tennessee and states contiguous to it. That approach would be in accordance with the duty of this Court to construe and apply the rules of evidence " * * * to the end that the truth may be ascertained and proceedings justly determined." Rule 102, Federal Rules of Evidence.

## ON MOTION FOR INVOLUNTARY DISMISSAL

The plaintiff, as the representative of her decedent-husband's estate, seeks to recover from the defendant-hospital compensatory and punitive damages for his wrongful death. This action was conceived originally as a medical-malpractice action, see I, pretrial order herein of July 20, 1978; however, it is viewed more appropriately as an action arising from the alleged failure of the hospital to use due care in the selection of a particular anesthesiologist as one of its

also that " * * * [t]he court may waive this [provision] when it determines that the appropriate witnesses otherwise would not be available. * * * " *Idem*. The plaintiff contends that appropriate witnesses (that is, other than Dr. Price) are not available, and thus the Court should waive the aforementioned provision.

clinical staff physicians and its further alleged failure to use due care in retaining him as a member of its staff after his professional incompetence and lack of skill became apparent.

The plaintiff's decedent Mr. William L. Crumley was a patient in the hospital of the defendant Memorial Hospital, Inc. in Johnson City, Tennessee on April 2, 1974. On that date he underwent therein a surgical procedure involving a small, fixed bone in his ear. Dr. W. M. Mathis was his surgeon, and someone other than the plaintiff or her decedent had arranged for Dr. Oswald Berrios, a physician and anesthesiologist to administer anesthetics to him during that surgery.

Although a continuing moot question in the defendant's hospital and other hospitals is said to be whether the operating surgeon or the administering anesthesiologist is "in charge" of surgical procedures, " * * * [i]t is the custom and practice that the operating surgeon is in complete charge of the surgery room and all personnel connected with the operation. In matters of professional skill and decision, it is the duty of the personnel (nurses, anesthetists, and others) who may assist, to obey explicitly the orders of the surgeon. * * * " *Rural Educational Association v. Bush*, C.A. Tenn. (1956), 42 Tenn.App. 34, 298 S.W.2d 761, 765, certiorari denied (1957). That expression as to this matter of an intermediate appellate court of Tennessee, with petition for certiorari denied by the Supreme Court of Tennessee, should put to rest any intraprofessional controversy concerning it.

In the course of such procedure, Dr. Mathis found it feasible to utilize a specially-designed microscopic device to deal with an area of some $2 \times 3$ millimeters in the decedent's ear. This required intensive concentration of the surgeon upon that area. Dr. Mathis had progressed to the point of inserting therein a tiny prosthesis when he overheard Dr. Berrios call for the drug adrenalin. Dr. Mathis continued his surgical work, and in a few moments was asked by Dr. Berrios if the latter might look at the pupils of the decedent's eyes. Dr. Mathis inquired the reason therefor, and Dr. Berrios reported that the decedent's pulse was weak, and his blood pressure was low. Dr. Mathis inquired whether Dr. Berrios wished to look immediately, and Dr. Berrios replied: "Yes, the patient might be dead." Instantaneously, the drapes were removed from over the decedent's body, and these two physicians examined the decedent's pupils; he was found to have suffered a cardiac arrest and anoxic brain damage. He expired from anoxic brain damage on April 5, 1974.

At the conclusion of the plaintiff's evidence, the defendant moved for an involuntary dismissal of her claim on the ground that upon the facts and the law she had shown no right to relief, Rule 41(b), Federal Rules of Civil Procedure. The specific grounds therefor are:

1. that the plaintiff failed to prove the standard of care required of hospitals in this geographical area, in selecting, suspending and revoking privileges of members of medical staffs;

2. that the plaintiff failed to prove the defendant's negligence in granting Dr. Berrios privileges as a staff anesthesiologist or in failing to suspend or revoke them seasonably; and,

3. that evidence that Dr. Berrios had been granted fellowship in the American College of Anesthesiologists and had been granted a license by the Tennessee state licensing board for the healing arts created a *prima facie* presumption of his competence and skill as an anesthesiologist.

This is an action in which the Court's jurisdiction has been invoked on the basis of the diverse citizenships of the parties and the requisite matter in controversy. 28 U.S.C. §§ 1332(a)(1), (c). Both the claimed tort and the injury occurred within Tennessee. Thus, the substantive law of Tennessee applies. 28 U.S.C. § 1652; *Telecommunications, E. S. & S. Co. v. Southern T. S. Co.*, C.A. 6th (1975), 518 F.2d 392, 394[4]. There is merit to the second ground of the defendant's motion.

The rule in Tennessee is that, if a health-provider selects a physician who is skilled and competent in his or her profession, it is not liable for any mistake that physician may make at a subsequent time. *Quinn v. Railroad* (1895), 94 Tenn. 713, 30 S.W. 1036, 28 L.R.A. 552, 45 Am.Sr.Rep. 767, cited by Mr. Justice Potter Stewart (while a judge of this federal circuit) in *Union Carbide & Carbon Corporation v. Stapleton*, C.A. 6th (1956), 237 F.2d 229, 232. In the same year, the late Chief Justice Grafton Green characterized the standard of care implicated and explicated the rationale underlying that decision, as follows: " * * * In *Quinn v. Railroad*, * * *, it was held that a master, having used due care in the selection of a physician to treat his injured servant, is not responsible for the negligence or malpractice of that physician. This, because a physician uses his own judgment in the treatment of a patient. * * * " *Revell v. McCaughan* (1931), 162 Tenn. 532, 538(3), 39 S.W.2d 269.

It is believed that the converse of that is true, *viz.*, that if a health-provider does not use due care in the selection of a physician to treat those for whom health care is provided, the health-provider is liable for the subsequent negligence or malpractice of the physician selected. It is believed also that a hospital in Tennessee is a health-provider within the meaning of the foregoing rule. A hospital in Tennessee provides patients with those services which it is generally accepted that hospitals provide patients. *Sepaugh v. Methodist Hospital*, C.A.Tenn. en banc (1947), 30 Tenn.App. 25, 202 S.W.2d 985, 990[13], certiorari denied (1947). "Generally speaking, a hospital is a place appropriated to the reception of persons sick or infirm in body or mind [footnote reference omitted], to which people may resort for medical or surgical treatment. * * * " 40 Am.Jur.2d 851, Hospitals and Asylums, § 1.

It is admitted by the defendant that it had delegated to the members of its clinical medical staff, as its agents, its duty to screen and select as contractors new members of such staff. The evidence adduced by the plaintiff was insufficient to establish that such medical staff did not use due care in the initial selection of Dr. Berrios as a staff-member. The fact that Dr. Berrios subsequently was guilty of negligence or malpractice in causing the death of the plaintiff's decedent raised no presumption that the defendant " * * * was negligent in selecting him as a contractor. * * " *Mooney v. Stainless, Inc.*, C.A. 6th (1964), 338 F.2d 127, 131[8], certiorari denied (1965), 381 U.S. 925, 85 S.Ct. 1561, 14 L.Ed.2d 684. Therefore, it was incumbent upon the plaintiff to have proved that the hospital, through its medical staff, knew before April 2, 1974 that Dr. Berrios was incompetent and lacked skill as an anesthesiologist or, alternatively, that those members had information in their possession by that date that his incompetence was known. This is a crucial issue of fact; for, if Dr. Berrios was known at that time to be incompetent, or the medical staff of the hospital had information in its possession from which the incompetency of Dr. Berrios was apparent, then it cannot be said that the hospital acted with due care in permitting the physician to remain a member of its staff of anesthesiologists. So, there must be a consideration of what those staff members knew, and when they knew it.

As this Court understands, in some hospitals anesthetics are administered by an anesthetist who is not a physician, while in others (such as the defendant's herein) they are administered by an anesthesiologist who is a physician and an independent specialist in the practice of the administration of anesthetics. The surgeons on the defendant's staff found themselves delayed in early 1973 in scheduling elective surgical procedures, because of the unavailability to them to a desirable number of anesthesiologists. The application for privileges as such by Dr. Berrios was accepted, and he commenced temporarily his professional services at the defendant-hospital on July 2, 1973. Although his application was then incomplete, in that *inter alia* he had no license to practice medicine in Tennessee, he administered an anesthetic at the defendant-hospital on his first day of service.

Before being licensed, Dr. Berrios was permitted to administer anesthetics only if the general surgeon involved requested it and had assumed full responsibility therefor. (This permissiveness was a violation of the defendant's by-laws.) In September, 1973 Dr. Page Powell, a general surgeon and chairman of the defendant's division of general surgery, scheduled exploratory surgery on a patient, and Dr. Berrios was engaged under the above limitations to administer an anesthetic. An inoperable cancer was discovered in that patient and, during the surgical process, the patient suffered a cardiac arrest and expired. Dr. Powell experienced bilingual difficulties in communicating with Dr. Berrios during the ensuing resuscitation efforts but detected in him no medical incompetence. After that experience, Dr. Powell did not commission the services of Dr. Berrios again except in emergent situations and, early in 1974, eschewed those services completely.

Dr. Berrios was licensed by the state of Tennessee to practice medicine on October 1, 1973, at which time he was admitted to the staff of the hospital's division of anesthesiology for a probationary period. For the ensuing 6 months, Dr. Berrios was ostensibly under the supervision of Dr. A. D. Shelton, the chairman of the hospital's division of anesthesiology; however, a personality conflict soon developed between these two specialists, and Dr. Shelton did no supervising of Dr. Berrios. Another such specialist, Dr. Clarence E. Goulding, was then requested by Dr. Powell to assume the responsibility of such supervision. (Whether, and the extent to which he may have done so, was not made to appear.) Dr. Berrios remained in probationary status past April 2, 1974 when Mr. Crumley suffered fatal anoxia.

From the very outset of his services in this hospital, Dr. Berrios was the focal point of harsh criticism. The nurses in the defendant's operating room thought that he was not paying close-enough attention to surgical patients on a sustained basis, although it is not deemed unusual when anesthesiologists fail to monitor such patients closely and constantly. There were general and wide-spread complaints by nurses that Dr. Berrios "mistreated" them and required some of them to administer medications which they believed they were not qualified to administer. Nurses in the hospital's pediatrics division noticed that some of the children who had undergone surgical procedures with Dr. Berrios in attendance "stayed asleep too long after the operation." Dr. Berrios then became defensive and practiced his speciality in the operating room within a cubicle of sheets in which his actions could not be readily observed.

In November, 1973 Dr. Berrios was hailed before the executive committee of the hospital's medical staff for having refused the request of a general surgeon to administer an anesthetic to a patient in an emergency situation. It was decided after consideration by that committee that no action would be taken then against Dr. Berrios because of this isolated incident. At another time while Dr. John Platt was performing surgery of a gynecological nature, with Dr. Berrios administering the anesthetic, Dr. Platt became concerned that his patient was not ventilating properly. He and Dr. Berrios disagreed in this regard, and yet another anesthesiologist was summoned to the operating room for his opinion. The summoned anesthesiologist's opinion[1] coincided with that of Dr. Platt.

The aggregate of these and related instances inspired Dr. Powell to commence amassing "a file" on the performance of Dr. Berrios for the future consideration of the defendant's medical staff. It was not clear to Dr. Powell from the hospital's bylaws whether the privileges of Dr. Berrios, as a member of its medical staff, could be withdrawn before the expiration of his probationary period, and the hospital's counsel was consulted in that regard.

■ "Probationary period", as used in employment contracts, is generally not construed to mean that the probationer's em-

---

1. It was not otherwise shown which of those opinions was probably correct.

ployment is at the will of the employer,[2] *Royce v. Delta Intern. Industries* (1946 Sup.), 63 N.Y.S.2d 369, 370, rather that a status of experimental testing is implicated in which no commitment for continuance of employment is implied if, for any reason, the experimental relationship leads to a conclusion that a more extended relationship might be unsatisfactory, *Rhine v. Young Men's Christian Ass'n College* (1959), 339 Mass. 610, 162 N.E.2d 56, 59. Nonetheless, the bylaws of the hospital provided that a member of its medical staff could be removed summarily if a continuation of his or her privileges constituted a threat to the welfare of a patient.

Except for the isolated incident involving the surgical procedure in which Dr. Platt was engaged, there was nothing before April 2, 1974 to make apparent to the members of the defendant's medical staff that Dr. Berrios was administering anesthetics improperly or that he was applying substandard judgment, techniques or skill as an anesthesiologist. Despite all the information coming to him as chief of the hospital's division of general surgery and his own tragic experience, Dr. Powell by that date had not questioned formally the capability of Dr. Berrios as an anesthesiologist. As late as the time of the trial herein, Dr. M. S. Affifi, the chief of the defendant's medical staff and a general surgeon, would not have hesitated under normal conditions to utilize in a surgical procedure the services of Dr. Berrios in the latter's specialty.

The Court deems the care due by a hospital in the selection of an anesthesiologist for its staff to be of a higher degree than that which is due from it in the selection of other medical doctors generally. It is generally known within the territorial jurisdiction of this Court, and is not subject to reasonable dispute, see Rules 201(a), (b), Federal Rules of Evidence, that hospitals obtain in advance authorizations by and on behalf of their patients for the administration of such anesthetics as may be deemed necessary while the patient is hospitalized. In all but a miniscule part of the time, the patient is not acquainted with the anesthesiologist who provides these specialty services or with the reputation for skill and competence of that specialist.

The patient is accorded this service by the hospital only because it maintains a staff of anesthesiologists from which the services of one is selected by someone other than the patient. The patient is required to pay for the services of that specialist without having made a contractual agreement with him or her. The patient has no realistic way of being put on notice that an anesthesiologist, provided through the hospital in this manner, is not the employee of the hospital, such as a nurse-anesthetist would be, for whose negligent actions the hospital is responsible. Certainly, while in a hospital preparatory to undergoing surgery, a patient cannot be expected reasonably to be inquiring into such legal relationships of those providing him or her with health care.

Even so, as stated, the plaintiff has not carried her burden of showing by a preponderance of the evidence that the defendant-hospital failed to use due care in selecting Dr. Berrios for inclusion on the staff of its clinical division of anesthesiology. Neither has she shown by such preponderance that, while he remained such a member and before he performed professional services for the plaintiff's decedent on April 2, 1974, members of the clinical medical staff of the hospital knew that Dr. Berrios was or had become incompetent and unskillful in his profession or that they had information in their possession that the incompetence of Dr. Berrios was known.

For the plaintiff to have undertaken to demonstrate that some of the activities and reactions of Dr. Berrios may have been bizarre is insufficient. He was a licensed physician engaged in the practice of medicine, as defined in *O'Neil v. State* (1905), 115 Tenn. 427, 441, 90 S.W. 627. A physician exercises his or her own professional

---

**2.** As the defendant performs essential services for members of the general public, this Court deems it appropriate under the circumstances to suggest that the hospital's bylaws and probationary contracts might be adjusted in a manner to render the continuance of staff services subject to the will of the hospital during such probationary periods.

judgment in providing health services to a patient. *Revell v. McCaughan, supra,* 162 Tenn. at 538(3), 39 S.W.2d 269. " * * * 'No man [or woman] is held by law to a higher degree of skill than the fair average of his [or her] profession' * * *." *Union Ry. Co. v. Williams,* C.A. 6th (1951), 187 F.2d 489, 492[9, 10], certiorari denied (1951), 342 U.S. 839, 72 S.Ct. 65, 96 L.Ed. 634, citing and quoting from *Sanford-Day Iron Works v. Moore* (1915), 132 Tenn. 709, 713, 179 S.W. 373. There being no probative evidence of the fair average of the skill of the profession of anesthesiologists in the area of Dr. Berrios' practice, the Court is left to speculate whether Dr. Berrios' judgment, techniques and skill ever were substandard under that average.

The plaintiff having failed to prove that the defendant-hospital was proximately negligent in either granting Dr. Berrios privileges as a member of its clinical medical staff initially or in failing to suspend or revoke those privileges seasonably before her decedent's injury, she has not shown on the applicable law and the facts a right to relief. Accordingly, the defendant-hospital's motion hereby is GRANTED, and the plaintiff's action hereby is DISMISSED involuntarily. Rule 41(b), *supra.*