943 So.2d 209 (2006)
Doreen SIEGEL, A.R.N.P. and Ace American Ins. Co., Appellants,
v.
John S. HUSAK, Appellee.
No. 3D04-2310.
District Court of Appeal of Florida, Third District.
October 25, 2006.
*210 Greenberg Traurig and Arthur J. England, Jr., Elliot B. Kula and Daniel M. Samson; Weinberg, Wheeler, Hudgins, Gunn & Dial and Todd R. Ehrenreich and Lawrence E. Burkhalter, Miami, for appellants.
Deutsch & Blumberg and James C. Blecke; Charles B. Patrick, Miami, for appellee.
Before GERSTEN, SHEPHERD, and SUAREZ, JJ.
SHEPHERD, J.
This is an appeal by an advanced registered nurse practitioner and her insurer from an adverse jury verdict. The question presented is whether the nurse practitioner is individually responsible at law for a misdiagnosis, which was the ultimate responsibility of her supervising physician. Although there are circumstances in which a nurse practitioner can be found liable for the misdiagnosis of her supervising physician, we find there is a lack of competent substantial evidence in this case to support a verdict against the nurse practitioner and accordingly reverse the judgment below.

INTRODUCTION
In this medical malpractice action, the defendants were Dr. Lawrence Feldman and Doreen Siegel, a Florida licensed advanced registered nurse practitioner *211 (ARNP). The plaintiff was John S. Husak, a marketing director for Celebrity Cruise Lines.
Broadly speaking, there are three types of nursing licensure recognized by the laws of this state  licensed practical nurses, registered nurses, and ARNPs. See §§ 464.003(4)-(6), Fla. Stat. (2003). ARNPs are registered nurses who have achieved further training and certification, after which they can perform additional supervised medical procedures and tasks that normally cannot be lawfully performed by other types of licensed nurses. See § 464.003(3)(e), Fla. Stat. (2003). Florida law requires these procedures and tasks be "identified and approved" under the auspices of the State Board of Nursing, see § 464.003(3)(c), Fla. Stat. (2003), or conducted pursuant to a protocol developed and agreed to by the supervising physician and the ARNP. § 458.348, Fla. Stat. (2003) (formal supervisory relationship); § 464.012, Fla. Stat. (2003)(certification of ARNPs); § 64B8-35.002, Fla. Admin. Code (2003). When operating within the context of an advanced or specialized nursing practice and supervised as required by law, "[an] advanced registered nurse practitioner may perform acts of nursing diagnosis. . . ." § 464.003(3)(c)(emphasis added). It is neither disputed in this case that Feldman had the ultimate responsibility for the diagnosis and treatment of Husak, nor that Feldman negligently diagnosed Husak's medical condition. The issue in the case is whether or not Siegel, who was working under the direct supervision of Feldman, was separately negligent for the misdiagnosis. Because Siegel was working under the direct supervision of Feldman, and because she did not commit any misdeed or act of negligence separate from that for which Feldman had the ultimate responsibility, we conclude the trial court erred in failing to direct a verdict in this case for Siegel.

FACTUAL BACKGROUND
This case arises out of a complaint filed by Husak against Feldman and Siegel. Siegel worked in Feldman's medical office under his supervision. The complaint alleges decreased arm use resulting from defendants' failure to properly diagnose ruptured tendons in Husak's arms and either to timely refer him for a MRI study of his condition or to an orthopedic surgeon.
The record reflects that on January 10, 2001, Husak traveled to Feldman's office for treatment for injuries suffered to his arms that morning while lifting weights during his morning workout in the gym at his place of employment. Husak testified that while working out, he slipped as he pulled forward on a weight machine, felt immediate pain, and heard a "popping sound" in his arms.
Husak was first seen by Siegel, who determined, both from the receptionists' record of Husak's case history and vital signs, and from her own examination, that Husak suffered from a muscle strain or sprain. Husak's chart includes Siegel's examination notes, her nursing diagnosis, and the fact Husak reported "popping sounds" in both arms. Feldman also saw and spoke with Husak during this visit, but the record is devoid of any evidence that he actually examined Husak. Nor is there any evidence Feldman did a post-visit review of Husak's chart to indicate his professional agreement or disagreement with Siegel's nursing diagnosis, as was required by the practice and protocol that existed between them.
On Saturday, January 13, 2001, Husak called Siegel's personal number to report swelling and bruising in his arms. Siegel repeated the diagnosis and recommended *212 course of treatment, and asked Husak to return on January 15, 2001. On that day, Siegel again examined Husak. Husak's arms were black and blue, but there was no deformity in his muscles and he had full range of motion. Siegel prescribed anti-inflammatory medication and rest, and established a follow-up appointment for January 19. Feldman saw and spoke with Husak at the January 15 visit, and this time signed Husak's chart, indicating that in his professional opinion Husak had been properly diagnosed.
On January 19, 2001, Husak visited Siegel in Feldman's office for a third time. She again examined him, noting the bruising and tenderness were improving. Feldman did not see Husak on this date, but later signed Husak's chart to reflect concurrence with Siegel's recommendations in accordance with the practice established between them. On two of these three visits, Husak received cosmetic treatments from Siegel in the form of a Botox injection and glycol peels.
Four months later, in May 2001, Husak, on his own initiative, sought a MRI study of his arms through Feldman's office. The results of the MRI, which included Husak's biceps but not his tendons, showed a condition consistent with muscle sprain. Siegel, who by then had left Feldman's employ but was covering somebody's shift as a favor, happened to be in the office on the date Husak came to retrieve the MRI results, and Siegel handed the results to Husak. According to her testimony, Siegel did not discuss the results with Husak because she did not order the MRI herself. The MRI results showed "[f]indings consistent with Type 1 Muscle Strain involving the distal biceps muscle or areas of muscle contusion."
In July 2001, Husak sought an orthopedic consultation. At this time, Husak saw Dr. Keith Hechtman, an orthopedic surgeon, who advised Husak he had torn biceps tendons. Hechtman advised Husak surgery was unnecessary because Husak's job did not require heavy labor, Husak had full range of motion, and Husak's only limitation was an inability to use weight machines.
Later that same month, Dr. Raj Pandaya, an orthopedist, examined Husak. Pandaya confirmed Hechtman's diagnosis of ruptured biceps tendons and recommended surgery with orthopedic surgeon Dr. Bernard Morrey. Pandaya testified Husak would have had a greater chance at a full recovery had the surgery occurred within the first week-and-a-half of the injury.
Ultimately, Morrey performed reconstructive surgery on Husak's biceps. Although Husak did not have 100% recovery, Morrey placed no weight-lifting or other limitations on Husak subsequent to the surgery. According to his employer, Husak was able post-operatively to satisfactorily perform his employment duties. There is conflict in the record concerning the extent to which his imperfect tendons affect Husak in the performance of his daily personal tasks.
After a six-day trial, a jury awarded Husak $1,848,068.50 medical expenses, lost earnings, and pain and suffering, apportioning fifty percent of the fault to Feldman as a Fabre defendant.[1] Siegel's post-trial motions included a motion for judgment notwithstanding the verdict, new trial, remittitur, and for setoff, all of which were denied and now assigned as error on this appeal. Because we conclude that the trial court erred in not granting Siegel's motion for judgment notwithstanding the *213 verdict, we need not consider Husak's other grounds for error.

DISCUSSION
At the outset, it is important to recognize that Florida law does not permit ARNPs to perform acts of medical diagnosis and treatment without supervision. Section 464.003(3)(c), Florida Statutes (2003), provides "[an] advanced registered nurse practitioner may perform acts of nursing diagnosis and nursing treatment of alterations of the health status."[2] (Emphasis added). However, Florida law expressly states an ARNP may only perform such tasks pursuant to a formal protocol established between a supervisory physician and the nurse, see § 458.348(1)(a), Fla. Stat. (2003), and further that in all circumstances, the physician "shall maintain supervision for directing the specific course of medical treatment." § 464.012(3), Fla. Stat. (2003). In this case, the protocol established between Feldman and Siegel included Feldman's obligation, in his supervisory capacity (usually on the same or next day), to promptly review the chart or file of each patient seen by Siegel and to initial his concurrence or disagreement with Siegel's work. The record is devoid of any testimony that Feldman ever looked at that portion of Husak's chart reflecting his first visit. If so, Feldman would have seen Siegel's note that "popping sounds" accompanied Husak's injury. It is not disputed that a "popping sound" is a symptom of a ruptured tendon and an indicator of a need for a referral.
There is no evidence in the record that Siegel violated a Florida standard of care for ARNPs at the time she made her "nursing diagnosis." In fact, the evidence is to the contrary. Nurse Siegel placed on Husak's chart and in his file all of the information from which her supervisor, Dr. Feldman, could have made the correct diagnosis or referral had he been attentive. For this reason, we find that this case is governed by the reasoning in Drew v. Knowles, 511 So.2d 393 (Fla. 2d DCA 1987). In Drew, the Second District held:
[A] nurse acting under the direction and orders of a physician in matters involving medical professional skill and judgment is absolved from liability for the acts so performed, absent independent negligence upon the part of the nurse, and absent a performance of those acts or duties a nurse is called upon to perform at a level of performance well below that which is expected of a similarly qualified nurse. Similarly, where a nurse is called upon to exercise professional judgment or to perform discretionary ministerial acts and does so negligently, the nurse may be liable.
Id. (emphasis added). In Drew, the court worked through a twenty-four count, 230-paragraph complaint and affirmed the dismissal of a medical malpractice complaint against five registered nurses and two respiratory therapists on the ground there were no allegations of breach of "any specific duty" owed by those defendants, while at the same time reversing as to three other registered nurses and one respiratory therapist on the same ground. Id. at 395.
Similarly, in this case, there was no "specific duty" owed by Siegel to Husak which was breached by her. Siegel was *214 acting under the specific direction and orders of Feldman when she made her "nursing diagnosis." The actual responsibility for the diagnosis lay with Feldman. Cf. Variety Children's Hosp., Inc. v. Perkins, 382 So.2d 331, 334-35 (Fla. 3d DCA 1980)(holding that a surgeon is "captain of the ship" for acts performed under his control and direction). Although her initial impression and recommended course of treatment was flawed, Siegel gave her superior and supervisor all information necessary for him to make the correct judgment. Had she not done so  for example, had she failed to record the allegedly tell-tale "popping sounds" on Husak's chart  there would have been a triable issue of nursing negligence. There is no evidence of independent negligence by Siegel apart from that for which Feldman was responsible. Under the law of this state, only if there had been some independent act of negligence by Siegel could she then have been found liable to Husak in this case.
While it may seem counter-intuitive to excuse Siegel from an incorrect diagnosis when the patient indisputably passed through her care, the nursing profession is governed by a number of standards which differ from those governing other members of the medical profession. See Louisell and Williams, Medical Malpractice, Ch. 16A "Nursing Negligence", Vol. 2 (1992). Among them is the long-settled legal principle that "[w]hen a nurse acts under the orders of a private physician in matters involving skill and decision, she is absolved from liability for her acts." Buzan v. Mercy Hosp., 203 So.2d 11, 13 (Fla. 3d DCA 1967)(quoting Rural Ed. Ass'n v. Bush, 42 Tenn.App. 34, 298 S.W.2d 761, 767 (1957)). See also Wilson v. Lee Mem'l Hosp. 65 So.2d 40 (Fla.1953); Beaches Hosp. v. Lee, 384 So.2d 234 (Fla. 1st DCA 1980).
Husak sought to circumvent this long-settled legal principle through the expert testimony of Guadalupe Barragan, a California nurse practitioner. However, Barragan, who had not studied the standard of care owed by Florida nurses to their patients until just before trial,[3] and who herself never diagnosed a ruptured tendon during her twenty-five-year nursing career, was permitted by the trial court to offer the legal opinion based upon the Florida statutes that Siegel (1) owed an independent legal duty to Husak and (2) breached that duty by departing from a so-called national standard of care, which Barragan equated to a Florida standard of care. As previously demonstrated, there is no statutorily established duty upon which a jury could find Siegel guilty of medical malpractice in this case. Ordinarily, the question of the existence of a legal duty is one of law. The law of this state *215 does not place an "independent legal duty" on Siegel to properly diagnose Husak. Barragan was not competent to contradict the law of this state. See Estate of Williams v. Condon, 771 So.2d 7, 8 (Fla. 2d DCA 2000)("[O]pinion testimony as to the legal interpretation of Florida law is not a proper subject of expert testimony."); Florida Power & Light v. Lively, 465 So.2d 1270, 1272 (Fla. 3d DCA 1985)(stating that whether duty exists is a question of law for the court). For these reasons, we need not reach Husak's second argument. However, if required to do so, we would also conclude Husak failed to offer sufficient competent evidence to support a charge that Siegel violated a national standard of care applicable to nurse practitioners in Florida in this case.[4]
For these reasons, we reverse the judgment below and remand with directions that Siegel's motion for judgment notwithstanding the verdict be granted.
Reversed.
SUAREZ, J., concurs.
GERSTEN, Judge (concurring).
I respectfully concur with the majority's decision to reverse and remand, directing a verdict in favor of Doreen Siegel, ("Siegel"). Although the majority's analysis is on point, because this case turns on the standard of care issue, it is the only issue that needs to be addressed.
A trial court should direct a verdict in favor of a health care provider when testimony fails to show: (1) the proper standard of care; and (2) the health care provider deviated from the standard of care causing the patient's injury. See Robbins v. Newhall, 692 So.2d 947 (Fla. 3d DCA 1997). Although Florida law does not explicitly specify the standard of care for advanced registered nurse practitioners ("ARNP"), the duty for ARNPs and other health care providers should mirror a physician's duty to the patient.
In Florida, the proper standard of care for physicians is a "duty to use ordinary skills, means, and methods that are recognized as necessary and which are customarily followed in the particular type of case according to the standard of those who are qualified by training and experience to perform similar services in the community or in a similar community." See Sweet v. Sheehan, 932 So.2d 365 (Fla. 2d DCA 2006)(emphasis added); Torres v. Sullivan, 903 So.2d 1064 (Fla. 2d DCA 2005). This standard is also known as the locality rule.
Because Florida adheres to the locality rule for physicians, then the same standard should logically apply to ARNPs. Here, the patient, John Husak ("Husak"), presented a California nurse practitioner to testify on an ARNP's standard of care. The expert admitted that she was not familiar with the standard of care for Florida *216 ARNPs and instead testified about a national standard of care.
Husak's expert inaccurately equated a national standard to Florida's locality rule. Further, the expert testimony failed to show the proper standard of care for nurses in Florida, and that Siegel deviated from the proper standard of care. Therefore, the trial court erred in refusing to grant a directed verdict in favor of Siegel.
NOTES
[1] Fabre v. Marin, 623 So.2d 1182 (Fla.1993).
[2] A "nursing diagnosis" is defined by statute as "the observation and evaluation of physical or mental conditions, behaviors, signs and symptoms of illness, and reactions to treatment and the determination as to whether such conditions, signs, symptoms, and reactions to treatment and the determination as to whether such conditions, signs, symptoms, and reactions represent a deviation from normal." § 464.003(3)(d), Fla. Stat. (2003). "Nursing treatment" is defined in section 464.003(3)(e), Fla. Stat. (2003).
[3] The trial court rebuffed Siegel's attempt to preclude Barragan from testifying on the basis that she was offering "surprise" testimony in violation of the principle established in Binger v. King Pest Control, 401 So.2d 1310 (Fla.1981)(noting that rules governing discovery and pretrial procedure are intended to eliminate surprise in cases where a witness is not disclosed in accordance with pretrial order). See also Office Depot, Inc. v. Miller, 584 So.2d 587 (Fla. 4th DCA 1991)(expanding Binger principle to hold that allowing the presentation of a witness's changed testimony is tantamount to permitting an undisclosed adverse witness to testify). Although conduct of this type impairs truth-seeking, see Grau v. Branham, 626 So.2d 1059 (Fla. 4th DCA 1993)("[a]ll the discovery rules would be for naught if one side were able to wait until after trial started to establish key pieces of evidence"), and contributes to the diminishment of public confidence in our civil justice system, we conclude the trial judge did not abuse his discretion by not sanctioning Husak under Binger in the circumstances of this case. Binger, 401 So.2d at 1313 (stating it is within the trial court's discretion whether to permit or exclude witness testimony).
[4] On this charge, Barragan attempted to reason  somewhat circuitously in our view  that because California, by her reckoning, has the same direct supervisory requirements as does Florida for ARNPs, and because the American Academy of Nurse Practitioners (AANP), of which both she and Siegel are members, credentials nurses and sets standards for practice, there exists a national standard. However, Barragan's syllogism fails because, as she admits, the standards of practice established by the AANP are unrelated to the specific standards for any particular state. Moreover, Barragan is incorrect in her assertion that California law concerning the supervision of ARNPs is the same as Florida's law. See Cal. Bus. & Prof.Code § 2725(b)(4)(West 2004); see also Fein v. Permanente Med. Group, 38 Cal.3d 137, 211 Cal.Rptr. 368, 695 P.2d 665 (1985)(interpreting nurse's functions of examination or diagnosis, as stated in section 2725(b)(4) not to be functions reserved to physicians).