79 F.3d 496
 LIFE CARE CENTERS OF AMERICA, INC., Plaintiff-Appellee,
Cross-Appellant,
v.
CHARLES TOWN ASSOCIATES LIMITED PARTNERSHIP, LPIMC, Inc.,
and Bruce Weinstein, Eugene H. Rosen, and John W.
Galston, Defendants-Appellants, Cross-Appellees.
 Nos. 94-5744, 94-5866.
 United States Court of Appeals,
Sixth Circuit.
 Argued Oct. 13, 1995.
Decided March 11, 1996.
Rehearing and Suggestion for Rehearing En Banc Denied April
24, 1996.*
 
 On Appeal from the United States District Court for the Eastern District of Tennessee; R. Allan Edgar, Judge.
 Thomas E. Ray, Ray & Sibley, Chattanooga, TN, G. Lee Garrett, Jr. (argued and briefed), David P. Baum (briefed), Jones, Day, Reavis & Pogue, Atlanta, GA, for Life Care Centers of America, Inc.
 Elaine B. Winer, Rice, Kreitzer & Winer, Chattanooga, TN, Leighton Aiken (argued and briefed), Felicia Latham, Owens, Clary & Aiken, Dallas, TX, for Charles Town Associates Ltd. Partnership, LPIMC Inc., Bruce Weinstein, Eugene H. Rosen, John W. Galston.
 Before: JONES and BATCHELDER, Circuit Judges; and COOK, Chief District Judge.*
 COOK, Chief District Judge, delivered the opinion of the court, in which JONES, J., joined. BATCHELDER, J. (pp. 515-16), delivered a separate opinion concurring in part and dissenting in part.
 
 
 1
 JULIAN ABELE COOK, Jr., Chief District Judge.
 
 
 2
 The parties to this action appeal several orders by the district court. The issues on appeal and cross-appeal are whether the district court erred when it (1) concluded that certain solicitation efforts by Life Care Centers of America (Life Care) were not violations of its fiduciary duty to the Defendants; (2) held that Life Care's solicitation efforts did not constitute a breach of its management agreement; (3) turned Life Care's motion to strike into a motion for summary judgment; (4) granted Life Care's motion in limine, thereby excluding evidence of its alleged mismanagement; (5) entered a summary judgment in favor of the Defendants with respect to Life Care's claim for tortious interference with a contract; (6) denied the Defendants' motion for a directed verdict; (7) awarded a directed verdict in favor of Life Care in connection with the Defendants' breach of contract claim; and (8) instructed the jury on the issue of mitigation of damages.
 
 
 3
 For the reasons that have been set forth below, we affirm in part and reverse in part the decisions of the district court, and remand the case for a new trial in accordance with this opinion.
 
 I.
 A. Facts
 
 4
 On November 10, 1982, Life Care entered into a written management agreement with the then-owner of Jeffersonian Manor, a nursing home in Charles Town, West Virginia. In 1987, Charles Town Associates Limited Partnership (Charles Town) acquired Jeffersonian Manor and retained Life Care as its managing agent. The management agreement contained a termination clause which, as a condition precedent, required Charles Town (1) to notify Life Care of any perceived breaches of their contract, and (2) to provide Life Care with an opportunity to correct any of the claimed contractual violations.
 
 
 5
 In 1990, the limited partners of Charles Town voted to make LPIMC their new managing general partner. On July 10, 1991, Life Care initiated a bid among Charles Town's limited partners to replace LPIMC as their managing general partner. LPIMC, upon learning of this contact with the limited partners, advised Life Care that it considered this solicitation effort to constitute substantive violations of their management agreement and its fiduciary duties as a managing agent. LPIMC also warned Life Care that its employment tenure with Charles Town would be terminated unless this activity ceased immediately. However, when Life Care refused to do so, its services were terminated.
 
 
 6
 Notwithstanding the cessation of its formal relationship with LPIMC, Life Care continued its bid to become the new managing general partner of Charles Town. However, these efforts were stymied in the spring of 1992 when the limited partners voted to reject Life Care's application. Thereafter, Life Care filed a lawsuit against LPIMC, Charles Town and its general partners, charging them with breach of contract/wrongful termination, tortious interference with a contract, and inducement to breach a contract.[1]
 
 B. Procedural History and Rulings at Issue
 1. Eighth Affirmative Defense
 
 7
 In connection with the breach of contract issue, the Defendants asserted in their eighth affirmative defense that Life Care had violated the following provisions of the management agreement:
 
 
 8
 1.1 Control Retained in Board. Owner, acting through its duly elected officers, shall at all times exercise control over the assets and operation of the nursing home and [Life Care] shall perform the duties herein required to be performed by it as the agent of Owner and in accordance with the reasonable policies and directives of Owner.
 
 
 9
 1.2 Methods of Operation. [Life Care] shall make substantial changes in the method of operating the nursing home only after timely notification to, and with consent of Owner. Changes made to conform to governmental laws, regulations and ordinances shall not be deemed "substantial" for the purposes of this agreement.
 
 
 10
 On March 17, 1993, Life Care filed a motion to strike, in which it challenged the efficacy of the Defendants' eighth affirmative defense. In support of this position, Life Care asserted that it only owed a fiduciary duty to the partnership as a whole--not to the individual partners. The district court agreed, holding that the Defendants had not shown that Life Care's solicitation efforts had violated its fiduciary duty to Charles Town. In its ruling, the district court concluded that the challenged activity of Life Care was not implicated by the solicitation of proxies from the limited partners because the pertinent sections of the management agreement only referred to the methods by which it could implement procedures for its day to day operation of the nursing home.
 
 
 11
 The Defendants asked the district court to reconsider its decision, arguing that (1) the issue of the fiduciary duty of a limited partnership's agent was novel and, thus, should not have been decided on a motion to strike, (2) their eighth affirmative defense was legally sufficient as pleaded, and (3) genuine issues of a material fact remained as to whether Life Care's actions were detrimental to Charles Town and, hence, violative of its fiduciary duty. On August 13, 1993, the Defendants' motion for reconsideration was denied.
 
 
 12
 Acting on the belief that the district court had turned Life Care's motion to strike into a motion for summary judgment without giving them an opportunity to demonstrate that a genuine issue of a material fact existed, the Defendants filed a motion to supplement the record on August 27, 1993. On February 7, 1994, the district court granted their motion, but declared that these additional matters did not create a genuine issue of any material fact to warrant the reversal of its earlier rulings.
 
 2. Evidence of Life Care's Mismanagement
 
 13
 In one of their affirmative defenses, the Defendants charged Life Care with mismanagement of the Jeffersonian Manor in violation of the management agreement. On February 10, 1994, Life Care filed a motion in limine in which it requested the district court to preclude the Defendants from introducing any evidence of mismanagement, contending that it had neither received any notice of an alleged breach of their management agreement nor had it been given an opportunity to correct any of the perceived deficiencies. The district court granted Life Care's motion in limine in part, and, as a result, precluded the Defendants from introducing any evidence of Life Care's alleged mismanagement.
 
 
 14
 3. Defendants' Motion for Summary Judgment as to Life Care's
 
 
 15
 Claim of Tortious Interference with a Contract
 
 
 16
 On March 2, 1994, the Defendants filed a motion which sought the entry of a summary judgment as to Life Care's claims of tortious interference with a contract. The Defendants argued that these claims were deficient as a matter of law because, in terminating Life Care as the managing agent, they were acting within the scope of their positions as general partners of Charles Town. The Defendants maintained that they, as agents of Charles Town, were not third parties to the management agreement and could not have tortiously interfered with the contractual relationship about which Life Care complained. In its opposition papers, Life Care contended that a general partner or agent could tortiously interfere with a partnership's contract if the act was committed with legal "malice" (i.e., not for the benefit of the partnership). Life Care claimed, in part, that the Defendants had failed to show that the termination of its services were in the best interests of Charles Town.
 
 
 17
 The district court granted the Defendants' motion for summary judgment and dismissed Life Care's claims of tortious interference after concluding that the Defendants were not third parties to the management contract inasmuch as they had acted within the scope of their authority as general partners.[2]
 
 
 18
 4. Defendants' Motion for Directed Verdict on the Basis of
 
 Lack of Personal Liability
 
 19
 The Defendants moved for a directed verdict, contending that Life Care had failed to present any evidence during its case in chief that their administrative decisions had been made in bad faith and against Charles Town's best interests. The district court disagreed and, thereafter, denied their motion.
 
 
 20
 5. Life Care's Motion for Directed Verdict on the Basis of the Defendants'
 
 Lack of Defenses
 
 21
 At the close of the Defendants' case, Life Care moved for a directed verdict on its breach of contract claim. The Defendants had no legal defense to this claim because the district court had (1) held that Life Care's solicitation had not violated any fiduciary duties to Charles Town and (2) precluded them from introducing any evidence in support of their allegation relating to the mismanagement of Jeffersonian Manor. Nevertheless, the Defendants opposed the motion, contending that Life Care had failed to demonstrate that it had fully complied with the management agreement. However, the district court rejected this argument, granted Life Care's motion, and left the issue of damages to be resolved by the jury.
 
 
 22
 6. Jury Instruction on Mitigation of Damages
 
 
 23
 The Defendants argued that Tennessee law required Life Care to mitigate its damages by accepting their offer of continued employment, which had been conditioned upon its cessation of the bid to become Charles Town's new managing general partner. The district court disagreed and instructed the jury as follows:
 
 
 24
 Life Care was under no obligation to withdraw its solicitation in order to minimize or mitigate its damages, and you may not consider Life Care's refusal to withdraw its solicitation as a basis for reducing any damages to which you find Life Care is entitled.
 
 II.
 A. Fiduciary Duty
 
 25
 There is no question that an agent owes a duty of loyalty and obedience to his principal, the breach of which provides a legal basis for the termination of the agency relationship. The Defendants correctly note that "[t]he relationship of a principal and agent is based on trust and confidence." Thomson McKinnon Sec., Inc. v. Moore's Farm Supply, Inc., 557 F.Supp. 1004, 1011 (W.D.Tenn.1983). Moreover,
 
 
 26
 [t]he relationship of principal and agent requires that friendly relations be maintained between the two, and an agent who owes a duty of service violates it by acting in such manner that this is impossible. He need not render cheerful obedience, but he must not be insubordinate in speech or by other manifestation, either to the principal or to third parties.
 
 
 27
 RESTATEMENT (SECOND) OF AGENCY § 380, comment b. Thus, "[w]hen the relationship of superior and subordinate is of such a personal and intimate nature that certain forms of public criticism of the superior by the subordinate would seriously undermine the effectiveness of the working relationship between them, the balance tips against the employee." Goldwasser v. Brown, 417 F.2d 1169, 1177 (D.C.Cir.1969), cert. denied, 397 U.S. 922, 90 S.Ct. 918, 25 L.Ed.2d 103 (1970); see also RESTATEMENT (SECOND) OF AGENCY § 409, comment b; Thomas v. Bourdette, 45 Or.App. 195, 608 P.2d 178 (1980) (agent who refused to obey orders and failed to prove that principal's directives would have injured business was properly discharged).
 
 
 28
 In the instant case, it is difficult to evaluate the merit of the Defendants' argument on this issue because the identity of the principal to whom Life Care owed a fiduciary duty is not clear. If Life Care's principals were the individual partners, then its fiduciary duties flowed to each of them. Under this theory, it is possible that Life Care's refusal to obey the general partners would warrant its dismissal. On the other hand, if Life Care's principal was Charles Town, then its fiduciary duty is quite clear. Under this alternative theory, it is possible that Life Care's refusal to obey the general partners' directives was in the best interest of Charles Town and, hence, its actions did not violate any fiduciary duties. Thus, the crux of the controversy in the instant case is not whether the termination of Life Care's service for being disobedient or disloyal to its principal was legally justifiable, but rather whether its fiduciary duties were violated.
 
 
 29
 Surprisingly, there is a virtual absence of case law around the country which discusses the identity of the principal in a limited partnership context. On the other hand, there is ample authority for the notion that an agent to a general partnership owes his fiduciary duties to the partnership. 68 C.J.S. PARTNERSHIPS § 150. On its face, this concept would suggest that the partnership is the principal of the agent. However, there is also authority which suggests that the agent's principal in the partnership context is each partner. See RESTATEMENT (SECOND) OF AGENCY § 20, comment e (1957) ("A person acting for an unincorporated group of persons may be an agent either of all members of the group or certain of them. If the one who authorized him to act for all has also been authorized by all of the members or certain of them to appoint him, he is the agent of such persons. Thus, one appointed by a member of a partnership who has been authorized to act to the partnership is the agent of all the partners"). Therefore, it is clear that an agent to a general partnership owes a fiduciary duty to the partnership and the partners. However, it is not clear whether the same conclusion follows with respect to an agent's relationship with limited partnerships or how the fiduciary duty to multiple principals would play out in situations which, like this one, may involve a conflict of interest between the principals. A conceptual understanding of partnership theory is vital to formulating an answer to this question.
 
 
 30
 The reason why agents of partnerships owe individual partners a fiduciary duty lies in the distinct nature of the partnership as a business organization. Partnerships, unlike corporations, do not have a separate existence from the partners who form the partnership. See Battista v. Lebanon Trotting Ass'n, 538 F.2d 111, 116 (6th Cir.1976) ("A corporation is generally recognized as a separate legal entity from its shareholders, officers and directors, but a partnership is not so considered"). Instead, partnerships have traditionally existed by virtue of their partners' existence. See UNIFORM PARTNERSHIP ACT § 4 (1914) (death of any partner terminates partnership under Tennessee law). However, this traditional view of partnerships as an "aggregate" of individuals is not always adequate in the context of limited partnerships.
 
 
 31
 The modus operandi of limited partnerships is an important reason why the "aggregate" theory of partnerships is not always applicable in this context. Limited partnerships are business organizations in which the limited partners are precluded by law from participating in the operation of the partnership. See generally Revised Uniform Limited Partnership Act (1975). In exchange for their abstention from participating in the management of the business, the law provides limited investors with limited liability for the debts of the partnership. Id. The operations of the business of the limited partnership are left to the general partner, who, unlike the limited partners, is personally liable for the operation of the partnership. Id. A general partner accepts this unlimited form of liability as a trade-off for the limited partners' investment in the partnership's business. Thus, in a typical situation, a general partner acts much like the management of a corporation, while the involvement of the limited partners is comparable to the shareholders of a corporation. In fact, the general partner has the primary responsibility of making the business successful in order to provide a satisfactory return for the partnership, including its limited partners. By contrast, the role of the limited partners is very passive, in that it consists of an investment in the partnership with the expectation of obtaining a profitable return. See Klebanow v. New York Produce Exchange, 344 F.2d 294, 297 (2nd Cir.1965) (Friendly, J.) ("[A] limited partner is more like a shareholder, often expecting a share of the profits, subordinated to general creditors, having some control over direction of the enterprise by his veto on the admission of new partners, and able to examine books and have on demand true and full information of all things affecting the partnership...."). Not surprisingly, an alternative approach to partnerships--one which views them as "entities" with lives that are independent of their partners rather than mere "aggregates" of people--has a compelling appeal in the limited partnership context. See generally HAROLD GILL REUSCHLEIN AND WILLIAM A. GREGORY, THE LAW OF AGENCY AND PARTNERSHIP 264 (2d Ed.1990) (discussing "aggregate" and "entity" theories of partnership).
 
 
 32
 Each theory of partnership is likely to produce a different result with respect to the issue of fiduciary duty in question. Under the "aggregate" theory of partnership, an agent's fiduciary duty would run first and foremost to the individual partners who compose the partnership. However, under the "entity" theory of partnership, an agent's fiduciary duty would run primarily to the partnership. The distinction of whether the fiduciary duty runs exclusively or primarily to the partners or the partnership becomes crucial when the interests between the partners and/or the partnership conflict. Under such circumstances, the agent will be required to act in the best interests of his "primary" principal, which in turn may require him to act against the best interests of the "subordinate" principal. Thus, the decision as to which partnership theory is "proper" and should be applied in a particular situation is a determinative one with respect to the issue of fiduciary duty.
 
 
 33
 Unfortunately, the common law provides little conclusive guidance on the subject inasmuch as the issue of the "proper" partnership theory is an ongoing debate:
 
 
 34
 Some jurisdictions reached far toward an entity theory by not permitting creditors to reach the individual assets of partners until the partnership assets were first exhausted.
 
 
 35
 The common law at the time of the drafting of the U.P.A. essentially favored the aggregate approach although it created a number of serious problems. A very few jurisdictions and some scholars favored the entity approach. The law seemed to be slowly developing toward some version of the entity approach at the time. In fact, the first draft of the U.P.A. was based clearly on an entity approach having been prepared by Dean Ames. This view was not favored and the ultimate version of the U.P.A. as drafted by Dean Lewis adopted the aggregate approach with some modifications.... Further, the U.P.A. as enactedwas ambiguous enough so as not to cut off further judicial progress toward the entity approach.
 
 
 36
 At least one jurisdiction [Arkansas] has determined that the U.P.A. did not embrace the entity theory, but instead retains the common law aggregate theory.
 
 
 37
 The entity approach tends to keep its attractiveness to courts and commentators mainly because it is realistic and closely in accord with the expectations of most businessmen.
 
 
 38
 Id. Unfortunately, Tennessee case law does not shed light on this issue. In fact, there are no reported Tennessee cases which have addressed the two competing theories of partnership or the specific issue of an agent's fiduciary responsibilities that is before the Court. Thus, in the absence of clear guidance on the subject, the counsel of Reuschlein and Gregory, both of whom advocate that the constraints and formalisms to which the courts have traditionally given rigid adherence be rejected and, instead, the realities of a specific situation be examined in order to fashion an appropriate remedy, is particularly appealing:
 
 
 39
 A pragmatic approach to the controversy is to reject either theory and simply to solve problems of partnership law as they arise, with the solution being dictated not by legal formalism, but by the merits of particular solutions. This eclectic approach while inconsistent in terms of formal logic has much to recommend it.
 
 
 40
 Id. The only case in the country, other than the instant one, in which the issue of fiduciary duty has been decided, embraced this "eclectic" approach. Ironically, that case involved virtually the same parties who are involved in this case.
 
 
 41
 In Life Care Centers of America, Inc. v. East Hampden Assoc. Ltd. Partnership, et al., Case No. 91-CV-2410 (D.Colo. Sept. 29, 1992) (attached as Volume II, Exhibit 7 of Joint Appendix), Life Care sued LPIMC, Weinstein, Rosen, and Galston, among other persons, as the general partners of a limited partnership which owned several nursing homes. As in the instant case, Life Care had been dismissed as the managing agent of the nursing homes for soliciting the limited partners of the limited partnership in an attempt to oust the general partners.
 
 
 42
 The district court concluded that the agents of the limited partnerships, such as Life Care, not only owed a fiduciary duty to the partnership, but also to the partners. Id. Through this holding, the district court implicitly rejected the dichotomy that is presented by the "aggregate" and "entity" theories of partnership, finding that the limited partnership at issue was a hybrid business structure with traditional "aggregate" aspects (i.e., the flow of fiduciary duty to the partners) and corporate-like "entity" aspects (i.e., the flow of fiduciary duty to the entity).
 
 
 43
 Having concluded that the agent owed a fiduciary duty to the partnership and the individual partners, the Colorado court dealt with the conflict of interest which arose between the agent's duty of loyalty to the partnership and the agent's duty of loyalty to the individual partners, including the general partners, in the following manner:
 
 
 44
 [I]n the event that the interests of the partnership's incumbent management and its limited partners conflict, an agent, in an attempt to serve the best interests of the partnership and its limited partners, may take action which may not be in the best interest of present management. Just as a shareholder has the right to change incumbent management, so does the limited partner have such a right. Limited partnerships provide for such a change. It is not a breach of fiduciary duty to offer to the limited partners a change in general partner in a manner which is in accord with the provisions of the limited partnership agreement, especially in the belief that the general partner is not acting in the best interests of the limited partnership.
 
 
 45
 Id.
 
 
 46
 In East Hampden, the court, although determining that the collective interests of the limited partners and the interests of the partnership were basically identical, recognized that the collective interests of the limited partners and the partnership may conflict with those of the general partner. This premise is essentially correct. The interest of the general partner in the prosperity of the partnership could conflict with a competing interest in maintaining his position as the general partner even if a change of a leadership would be in the best interest of the partnership.
 
 
 47
 In dealing with the conflict of interest dilemma, the district court allowed the agent to act in the best interest of the partnership even if such acts were not in the best interest of the general partner. Thus, the court in Colorado clearly adopted the viewpoint that the individual interests of the partners, including those of the general partners, were subordinate to the collective interests of the limited partners and the partnership. Therefore, while the court implicitly embraced a hybrid approach to the business structure known as the limited partnership, it nevertheless recognized that, in the modern business world, the "entity" component of this hybrid business structure predominates over its "aggregate" counterpart.
 
 
 48
 By contrast, the approach of the district court in Tennessee represented a total rejection of the "aggregate" theory of partnership and a complete endorsement of the "entity" theory counterpart. In deciding that Life Care had only a fiduciary duty toward Charles Town, the district court treated the partnership as a business entity that is indistinguishable from a corporation. See Order, June 29, 1993 ("[I]f Life Care owed a fiduciary duty, it was owed to the limited partnership and not to the individual partners. Defendants have not shown that a mere communication made in an effort to oust the incumbent general managing partner of the limited partnership, LPIMC, violated any duty owed to that limited partnership, Charles Town"). While the simplicity of this approach is seductive, it is misdirected.
 
 
 49
 Although a limited partnership does have many of the characteristics of a corporation, it is not only a "corporate" type of business entity, but it is also an "aggregate" of partners as it is underscored by certain aspects of the structure, such as the personal liability of general partners. Nevertheless, an analysis of the business reality of limited partnerships suggests that this business structure has a strong "entity" character, in that its identity and existence is separate and apart from its individual partners whose participation in the operation of the limited partnership is minimal. It is this "entity" character which requires that the management of the limited partnership be placed in a quasi-corporate light and subjected to special constraints. Therefore, while it is important to recognize that fiduciary duties flow to the individual partners of a limited partnership, it is also appropriate to subordinate those interests to those of the entity when a conflict of interest arises.
 
 
 50
 In order to comply with this standard, an agent who is accused of a breach of fiduciary duty must point to a specific divergence of interests between the individual partner and the limited partnership that would justify his conduct (e.g., the wasting of corporate assets or an involvement of the general partner in self-serving transactions with the partnership).[3] An agent can also discharge his burden by demonstrating that he had a justifiable belief which was well-grounded in fact and law that a specific divergence existed which warranted his decisions.[4]
 
 
 51
 In the instant case, Life Care has made several accusations against the general partners, including their mismanagement of the limited partnership. If Life Care had a reasonable belief as to the accuracy of its allegations, then it was justified in soliciting the limited partners for the ouster of the general partners. However, the record is not conclusive as to whether Life Care's accusations were based on any reasonable belief. Quite the contrary, the general partners have denied the accuracy of these accusations, attributing them to Life Care's desire to become the general partner of Charles Town at any cost. Thus, a genuine issue of a material fact remains as to the reasonableness of Life Care's belief, if any, that the specific interests of the general partners and Charles Town were in conflict which, in turn, would warrant its solicitation of the limited partners notwithstanding its fiduciary duty to the general partners.[5] The district court erred in concluding otherwise.
 
 B. Breach of Contract
 
 52
 In their eighth affirmative defense, the Defendants alleged that they were justified in terminating Life Care's services because the acts of solicitation, as well as its refusal to desist, constituted a breach of the following provisions of the management agreement:
 
 
 53
 1.1 Control Retained in Board. Owner, acting through its duly elected officers, shall at all times exercise control over the assets and operation of the nursing home and [Life Care] shall perform the duties herein required to be performed by it as the agent of Owner and in accordance with the reasonable policies and directives of Owner.
 
 
 54
 1.2 Methods of Operation. [Life Care] shall make substantial changes in the method of operating the nursing home only after timely notification to, and with consent of Owner. Changes made to conform to governmental laws, regulations and ordinances shall not be deemed "substantial" for the purposes of this agreement.
 
 
 55
 The district court correctly concluded that the provisions at issue within the agreement referred only to the process by which Life Care could implement procedures for the day to day care of the nursing home and, hence, were not implicated by the solicitation of proxies from the limited partners.
 
 
 56
 The Defendants advocate a reading of the management agreement that, in the judgment of this Court, is severely strained and must be rejected. In essence, they claim that the clause which requires Life Care to "perform the duties ... in accordance with the reasonable policies and directives of Owner" obligated it to obey all reasonable directives by the Defendants. Since it is uncontroverted that Life Care refused to stop its solicitation efforts among the limited partners of Charles Town, the Defendants insist that the only remaining question on this issue is whether their directive was "reasonable," as required by the management agreement. This, in their opinion, is a jury question.
 
 
 57
 This Court disagrees. It is clear from a reading of this clause that it is designed to regulate the relationship between the Defendants and Life Care with respect to the daily operations of the nursing home. Inasmuch as the solicitation efforts by Life Care did not directly relate to its management of the nursing home as a managing agent, this clause was neither implicated nor breached by this challenged conduct.
 
 
 58
 The Defendants have also asserted that Life Care's advocacy of substantial changes in the management operations of Charles Town during its contact with the limited partners constituted a violation of the terms and conditions of the management agreement which, in part, precluded the adoption and implementation of "substantial changes in the method of operating the nursing home."[6] This argument must be rejected as well. Life Care's proposal never instituted unauthorized substantial changes. It only proposed such changes. Thus, Life Care's proposal neither implicated nor breached the provision in question.
 
 C. Exclusion of Mismanagement Evidence
 
 59
 The Defendants affirmatively asserted in their pleadings that Life Care had mismanaged Jeffersonian Manor in violation of its obligations under the management agreement. On February 10, 1994, Life Care filed a motion in limine in which it requested in part that the Defendants be precluded from introducing any evidence of mismanagement. It was Life Care's position that its termination of service as a management agent was without any legal basis because the Defendants were not aware of the claimed acts of mismanagement at the time of the firing. Moreover, Life Care claimed that the Defendants should not be allowed to use the alleged mismanagement as a shield against its claims because they had failed to provide it with notice and an opportunity to correct the alleged deficiencies as required by the terms of the management agreement.
 
 
 60
 The district court adopted Life Care's position and, thereafter, suppressed the evidence of mismanagement, finding that (1) the Defendants had not properly preserved this affirmative defense in the final pretrial order and (2) Tennessee law precluded them from retroactively justifying its administrative decision on any grounds other than those which had actually motivated the termination.
 
 1. Final Pretrial Order
 
 61
 The Defendants argue that the holding by the district court (to wit, the issue of mismanagement had not been preserved in the final pretrial order) amounted to an abuse of discretion. The Defendants' final pretrial order does contain some language which generally describes the remaining issues of law in this case that could arguably be interpreted as an affirmative defense relating to Life Care's alleged mismanagement of the nursing home.[7] However, the absence of language which specifically addressed the subject of mismanagement lends support to the conclusion of the district court that the final pretrial order only contained a preservation of those arguments in support of the Defendants' eighth affirmative defense.
 
 
 62
 Nevertheless, it is clear from the record that the defense of mismanagement had received specific attention by the parties throughout the litigation. In fact, this issue had been the subject of a discovery request by Life Care and an extensive response by the Defendants.[8] Thus, it is equally clear that Life Care was fully aware of the Defendants' mismanagement defense. Under such circumstances, the preclusion of mismanagement evidence by the district court on the basis of the Defendants' failure to specifically list the mismanagement defense in the final pretrial order was unjust under the facts and circumstances of this case. However, as the ensuing discussion explains, the defense of mismanagement is not admissible in this case under Tennessee law and, therefore, the decision of the district court to exclude this issue on the basis of the deficiencies in the final pretrial order does not amount to reversible error.
 
 
 63
 2. Substantive Validity of the Mismanagement Defense
 
 
 64
 The United States Supreme Court has held that
 
 
 65
 [w]here a party gives a reason for his conduct and decision touching anything involved in a controversy, he cannot, after litigation has begun, change his ground, and put his conduct upon another and a different consideration. He is not permitted thus to mend his hold. He is estopped from doing it by a settled principle of law.
 
 
 66
 Ohio & Mississippi Ry. Co. v. McCarthy, 96 U.S. 258, 267-68, 24 L.Ed. 693 (1878). Tennessee courts have adopted this precise holding. See, e.g., Loftis v. Stuyvesant Ins. Co., 54 Tenn.App. 371, 390 S.W.2d 722, 728 (1964). Nashville Marketplace Co. v. First Capital Inst. Real Estate, Ltd.-2, 1990 WL 33373, 1990 Tenn.App. LEXIS 212 (Tenn.App. March 28, 1990), illustrates this principle.
 
 
 67
 In Nashville Marketplace, the parties had entered into an agreement for the sale of a shopping center. Id. at 1, 1990 Tenn.App. LEXIS at 2. Inasmuch as the shopping center had not been completely leased during the negotiations, the parties included a "rental escrow agreement" in the sales contract whereby the current owner of the shopping center was required to obtain additional leases in exchange for the progressive disbursement of certain monies to be held in an escrow account. Id. On the basis of this agreement, the owner obtained two potential leases. Id. at 2, 1990 Tenn.App. LEXIS at 4-6. However, the putative buyers of the shopping center rejected the leases, claiming that the proposed tenants (1) were incompatible with other occupants in the shopping center, and, (2) had insisted on unacceptable deviations from the standard lease. Id. The owner sued on the basis of a breach of the parties' vacant space escrow agreement. Id. However, the defendants alleged in their defense that, in addition to the reasons that had been given to the owner, they had rejected the leases because the prospective tenants were neither credit worthy nor had submitted adequate financial information. Id. at 6, 1990 Tenn.App. LEXIS at 15. The Tennessee Court of Appeals rejected their defense, holding that "once a contracting party has given reasons for its actions, it cannot attempt to justify its conduct on new and different grounds after suit is filed." Id. at 6, 1990 Tenn.App. LEXIS at 16.[9]
 
 
 68
 Utilizing the Nashville Marketplace rationale in the case before this Court, it is clear that the Defendants, in seeking to proffer Life Care's act of soliciting the limited partners of Charles Town as a ground for its decision, seek the benefit of relying on newly discovered information. However, the law of Tennessee precludes them from justifying their conduct retroactively on a ground that is different from that which was proffered at the time of its decision to terminate Life Care's services.
 
 
 69
 The Defendants insist that a different rule of law is applicable to their case, arguing that
 
 
 70
 [a] party to a contract who is sued for its breach may ordinarily defend on the ground that there existed, at the time, a legal excuse for non-performance by him, although he was then ignorant of the fact. He may, likewise, justify and assert a termination, rescission, or repudiation, of a contract by proving that there was, at the time, an adequate cause, although it did not become known to him until later.
 
 
 71
 College Point Boat Corp. v. United States, 267 U.S. 12, 15-16, 45 S.Ct. 199, 200-01, 69 L.Ed. 490 (1925).
 
 
 72
 The principle in College Point is inapplicable to the instant case. In College Point, the party who attempted to assert a pre-existing, but unexpressed, reason for its action as a defense to a lawsuit had an absolute contractual right to termination. Id. at 16, 45 S.Ct. at 201 ("An unconditional right to cancel can be availed of for the purpose of terminating a contract, even after a suit is brought....") By contrast, the Defendants in the instant case did not have an unconditional right to terminate Life Care from further employment. In fact, they were specifically required to provide Life Care with a notice of, as well as an opportunity to correct, any alleged violation of its contractual responsibilities.
 
 
 73
 The Defendants argue that this termination provision of the management agreement is immaterial to the admissibility of the defense. In support, they cite Micro Craft, Inc. v. Jones-Robertson, Inc., Slip. Op. (Tenn.Ct.App. March 6, 1985), for the proposition that an owner who fails to give the requisite notice of breach prior to exercising a right of termination may rely upon the breach to defend the termination at issue. However, Micro Craft, like College Point, is inapposite to the case at hand. In Micro Craft, the terminating party had never asserted a reason for the termination. In contrast, the Defendants in this case specified a reason for terminating Life Care, thereby inducing Life Care to believe that the specified reason, and no other, was the cause for the severance of the parties' contractual relationship.
 
 
 74
 In sum, the facts in Nashville Marketplace are indistinguishable from the facts in this case, and, thus, provides this Court with the operative rule of law for the issue at hand that precludes the Defendants from introducing evidence of mismanagement as a defense to their termination of Life Care.
 
 3. Summary
 
 75
 Although the district court erred by precluding the introduction of mismanagement evidence, its decision is supported by an alternative ground of estoppel. See Nashville Marketplace, 1990 WL 33373, 1990 Tenn.App. LEXIS 212. Therefore, the disposition of the issue by the district court is affirmed. See Harris v. City of Akron, 20 F.3d 1396, 1397 (6th Cir.1994), cert. denied, --- U.S. ----, 115 S.Ct. 512, 130 L.Ed.2d 419 (1994) (disposition can be affirmed if supported by applicable law or any ground upon which district court relied).
 
 
 76
 D. Dismissal of Life Care's Claim for Tortious Interference with Contract
 
 
 77
 Life Care alleged that the Defendants had tortiously induced a breach of its contract with Charles Town.[10] The Defendants challenged this claim with a motion for summary judgment in which they, as general partners who claim to have acted within the scope of their agency, were not third parties to the management agreement, and, hence, could not have "interfered" with the contract. The district court agreed with the Defendants and, thereafter, dismissed Life Care's claims for tortious interference with contract.
 
 1. General Partner Liability
 
 78
 The district court concluded that the general partner of a limited partnership could not be held liable for tortiously interfering with a contract of the limited partnership as long as the general partner was acting within his authority as a general partner. However, this conclusion is not supported by Tennessee law.
 
 
 79
 There is a virtual paucity of Tennessee cases that have spoken directly on the subject. Only one reported case, American Center-Nashville Ltd. v. Smith, 1992 WL 361352, 1992 Tenn.App. LEXIS 986 (Tenn.App.1992), has expressed a view on the matter, although it only did so briefly and in dicta. In American Center, the general partners of a limited partnership were sued, inter alia, for tortiously inducing a breach of contract between the plaintiff and the limited partnership. Id. at 6, 1992 Tenn.App. LEXIS at 16. The Tennessee Court of Appeals disallowed the claim because it concluded that there was no underlying breach of contract to support the plaintiff's allegation. Id. However, the court also announced that, even if the underlying breach had occurred, the plaintiff's claim would have failed because those general partners who had been accused of tortious inducement had acted on behalf of the limited partnership and were within the scope of their agency relationship to the limited partnership. Id. Specifically, the court held:
 
 
 80
 Since an entity cannot induce itself to breach a contract, ... the individual general partners ... can be found to have induced [the limited partnership] to breach the contract with [the plaintiff] only if they were acting on their own behalf. Throughout this entire project, ... [the] general partners ... were acting as [the limited partnership's] agents.
 
 
 81
 Id. Thus, the court indicated that, under Tennessee law, a general partner could be held liable for the tortious interference with a contract if the alleged breach between the partnership and a third party had been induced by a general partner while he was acting on his own behalf.
 
 
 82
 Although the district court in the case at bar concurred with the American Center rationale, it also concluded that when a party acts in his capacity as a general partner and/or under the authority of the general partner's office when the inducement of the breach occurs, he is acting as an agent of the partnership or within the scope of his agency. Order at 4-5, May 14, 1994. The import of this conclusion is that a general partner who utilizes the power of his office to advance his own interests at the expense of the interests of the limited partnership nevertheless acts "within the scope of his agency" because he takes such actions under the cloak of his office as general partner. Having acted "within the scope of his agency," this general partner cannot be personally liable for any torts that are committed as a result of his abuse of the office. Such an extension of immunity from suit for general partners is neither wise nor warranted by Tennessee law.
 
 
 83
 Contrary to the conclusions of the district court, the cases in Tennessee which touch upon the subject of agency do not suggest that an agent who acts within the cloak of authority that is afforded by a certain office, (i.e., office of a general partner) and whose acts are taken on the principal's behalf are necessarily "within the scope of the agency." Instead, the reported Tennessee cases on agency reveal that an agent can act within the apparent authority of his office and, at the same time, act on his own behalf and contrary to the interest of the principal. See e.g., Holloway v. Howerdd, 377 F.Supp. 754, 765-66 (M.D.Tenn.1973), aff'd, 536 F.2d 690 (6th Cir.1976) (three separate factors should be considered in determining whether principal is held liable for acts of agent); State v. Candler, 728 S.W.2d 756, 759 (Tenn.Crim.App.1986) (agent who acts within general scope of authority or office in manner that is antagonistic to principal, generally does not bind principal); Kean v. National City Bank, 294 F. 214, 222 (6th Cir.1923), cert. dismissed, 263 U.S. 729, 44 S.Ct. 179, 68 L.Ed. 528 (1924) (agent who acts within authority of office but nevertheless pursues transactions solely on his account and for his benefit "temporarily ceases to represent the principal....").
 
 
 84
 Thus, it would be inappropriate to read American Center as a case which supports the proposition that an act performed within the apparent authority of an agent falls automatically within the scope of his agency. A better interpretation of the American Center language would be that in order for an agent to act "within the scope of the agency," he must act within the apparent scope of authority of his office and on account of and for the benefit of his principal. Id. (agent who seemingly acts "within the scope of his agency" can temporarily "step[ ] outside of his representative character" if he pursues his own interests).[11]
 
 
 85
 On the basis of the foregoing, it is clear that American Center means that which it plainly stated; namely, that the general partner of a limited partnership can be held liable for tortiously inducing a breach of contract between the limited partnership and a third party when, in doing so, the general partners "were acting on their own behalf" rather than on behalf of and in the best interests of the limited partnership. Accord The Savage Is Loose Co. v. United Artists Theatre Cir., 413 F.Supp. 555, 560 (S.D.N.Y.1976) ("where a partner induces a breach of contract for his own benefit (as distinct from that of the partnership), or acts in bad faith in inducing the breach, he may be held liable"); Bank of New York v. Berisford Int'l, 190 A.D.2d 622, 594 N.Y.S.2d 152 (N.Y.App.Div.1993) (general partner may be liable for interfering with contract of partnership if act is committed in bad faith and for personal pecuniary gain); Kessler v. Levitt, 84 Civ. 282-CSH (slip op. S.D.N.Y., Sept. 10, 1984) ("When a partner acts to promote interests other than those of the partnership in causing the partnership to breach its contracts ... the shield of the partnership may no longer be raised.... The reasoning behind this exception to the general rule is that a partner who induces a breach for his own purposes is not longer acting as the partnership. Thus he no longer deserves the insulation from liability granted to those carrying out the business of the partnership").[12] Proof that the general partner was within the apparent authority of his office when he acted on his own behalf is only relevant to the issue of whether the partnership is liable to third parties for his conduct.[13]
 
 
 86
 2. Genuine Issue of Material Fact As To Whether The
 
 
 87
 Defendants Were Acting Within The Scope Of Their Agency
 
 
 88
 Life Care has alleged that the Defendants were pursuing their own interests when their contractual relationships were unilaterally severed. Specifically, Life Care has maintained that its services were terminated by the Defendants in the hope that this action would allow them to entrench themselves as general partners without any regard for the best interests of Charles Town.
 
 
 89
 Under Rule 56 of the Federal Rules of Civil Procedure, a summary judgment is to be entered if (1) the moving party demonstrates that there is no genuine issue as to any material fact, and (2) the evidence is such that a reasonable jury could find only for the moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In making this determination, the court is authorized to examine any pleadings, depositions, answers to interrogatories, admissions, and affidavits in a light that is most favorable to the non-moving party. Boyd v. Ford Motor Company, 948 F.2d 283 (6th Cir.1991), cert. denied., 503 U.S. 939, 112 S.Ct. 1481, 117 L.Ed.2d 624 (1992); See also United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962); Bender v. Southland Corp., 749 F.2d 1205, 1210-11 (6th Cir.1984).
 
 
 90
 An examination of the Defendants' motion for summary judgment in a light that is most favorable to the opposing party reveals that their general denials of Life Care's allegations did not eliminate all of the genuine issues of material facts which relate to the motivations, if any, behind their administrative decision.[14] Therefore, the entry of a summary judgment on the tortious interference issue should have been denied and a reversal is warranted.
 
 
 91
 E. Defendants' Motion for Directed Verdict for Lack of Personal Liability
 
 
 92
 At the completion of Life Care's case, the Defendants moved for the entry of a judgment as a matter of law, FED. R. CIV. P . 50(a), arguing that they were not jointly and severally liable under Tennessee Law for the breach of contract claim because there was no evidence that their conduct had been exercised in bad faith, without ordinary prudence, or contrary to the best interests of Charles Town. The statute upon which the Defendants relied, TENN.CODE ANN. § 61-2-405(b), reads in pertinent part as follows:
 
 
 93
 (a) A general partner shall discharge his duties as a party, including his duties as a member of a committee:
 
 
 94
 (1) In good faith;
 
 
 95
 (2) With the care an ordinarily prudent person in a like position would exercise under similar circumstances; and
 
 
 96
 (3) In a manner he reasonably believes to be in the best interests of the partnership.
 
 
 97
 ....
 
 
 98
 (d) A general partner is not liable for any action taken as a partner, or any failure to take any action, if he performed the duties of his office in compliance with this section.
 
 
 99
 The district court correctly denied the motion.
 
 The Tennessee code provides:
 
 100
 61-2-403. Rights and powers--Liabilities....
 
 
 101
 (b) Except as provided in this chapter, a general partner of a limited partnership has the liabilities of a partner in a partnership without limited partners to persons other than the partnership and the otherpartners. Except as provided in this chapter or in the partnership agreement, a general partner of a limited partnership has the liabilities of a partner in a partnership without limited partners to partnership and to other partners.
 
 
 102
 TENN.CODE ANN. § 61-2-403 (1980). It is clear, therefore, that general partners in a limited partnership are liable to third parties in the same manner as general partners in a general partnerships.
 
 
 103
 Partners in a general partnership "are liable jointly and severally for everything chargeable to the partnership." TENN.CODE ANN. § 61-1-114 (1989). Thus, general partners in a limited partnership are equally liable to third parties. See, e.g., In re Pioneer Inv. Servs. Co., 141 B.R. 635, 648 (Bankr.E.D.Tenn.1992) ("[The] general partner of The Cain Partnership, [a limited partnership,] is jointly and severally liable for everything chargeable to the limited partnership").
 
 
 104
 The Defendants' reliance on TENN.CODE ANN. § 61-2-405(b) is misplaced. This statute does not govern a general partner's liability to third parties, but merely provides the operative rule for a general partner's liabilities to the partnership and the other partners. See, e.g., Wilder Richman Corp. v. Willey, 1995 WL 247954 (Tenn.App.1995).
 
 
 105
 F. Life Care's Motion for Directed Verdict as to the Defendants' Liability
 
 1. Defendants' Lack of Defenses
 
 106
 At the close of the Defendants' case, Life Care asked the district court for a judgment as a matter of law under Fed.R.Civ.P. 50(a), asserting that the Defendants had no defense to its claim for wrongful termination. The district court agreed. This decision must be reversed inasmuch as it was necessitated in part by the district court's determination that, as a matter of law, Life Care's solicitation had not violated its fiduciary duty to Charles Town. This ruling must be vacated and, as a consequence, the directed verdict upon which it rested must be set aside as well.
 
 
 107
 2. Life Care's Failure to Put Evidence of Good
 
 Management/Burden of Proof Issue
 
 108
 The Defendants also argued that Life Care was not entitled to a directed verdict because of the absence of competent evidence that it fully complied with all of the terms and conditions of the management agreement. The district court disagreed, holding that it was the Defendants' burden to prove Life Care's lack of performance as an affirmative defense.
 
 
 109
 This decision by the district court must be vacated because its conclusions on Life Care's fiduciary obligations were erroneous. Therefore, the burden of proof issue, which has been raised by the Defendants, is moot. However, inasmuch as it is likely that the Defendants will reargue their position in connection with the new trial, the district court will reach the same conclusion, and the Defendants will appeal the issue once again, the Court will address the parties' respective burdens of proof at this juncture in the interest of judicial economy.
 
 
 110
 The law in Tennessee is completely silent as to the allocation of burdens of proof in a breach of contract case. Neither party has been able to produce a single Tennessee case that is apposite to this case. Nevertheless, the Court must use its best judgment in an effort to predict how the Tennessee Supreme Court would rule if confronted with this question. Cathey v. Johns-Manville Corp., 776 F.2d 1565, 1569 (6th Cir.1985), cert. denied, 478 U.S. 1021, 106 S.Ct. 3335, 92 L.Ed.2d 740 (1986).
 
 
 111
 It is clear that, under Tennessee law, a plaintiff cannot recover for a breach of contract if he has not fully performed under the contract. See TENNESSEE PATTERN CIVIL JURY INSTRUCTION § 13.01. However, this does not mean that the plaintiff has the burden of proof on the issue of his own performance.
 
 
 112
 The Defendants cite a number of cases from other jurisdictions which, in their opinion, suggest that the plaintiff in a breach of contract case always has the burden of proof as to his own performance under the contract. Those cases are wholly unpersuasive with respect to Tennessee law on the subject.
 
 
 113
 Typically, the plaintiff has the burden of pleading and proving every essential fact and element of his cause of action, not merely every fact that has been unnecessarily pleaded. 29 AM.JUR.2D EVIDENCE § 158. In the breach of contract context, it makes no sense to require the plaintiff to plead and prove the performance of a contract as an essential fact and element of the plaintiff's cause of action. The reasons for this conclusion are two-fold.
 
 
 114
 First, contracts frequently contain many provisions, some of which may be completely unrelated to the dispute in a lawsuit. Thus, from a judicial economy perspective, it is wholly impractical to impose upon the plaintiff the burden of peremptorily having to prove his own performance under those sections of a contract to which there is no challenge. Such a rule, if imposed, would obligate the aggrieved party to produce evidence that would inundate the record unnecessarily. Therefore, the performance of the plaintiff should not be an issue in the case unless and until the defendant raises it as an affirmative defense. Id. at § 160.
 
 
 115
 Second, allocating the burden of such an affirmative defense on the plaintiff would allow the defendant to sidestep certain relevant legal principles under Tennessee law. Under the laws of Tennessee, the Defendants are not entitled to defend against Life Care's charges of an alleged breach of contract on grounds other than those that were announced at the time of its termination of service of employment. Notwithstanding this rule, the Defendants' theory on the proper allocation of burdens would require Life Care to prove adequate management of the nursing home, thus opening the door for the Defendants to introduce mismanagement evidence as rebuttal material. In this manner, the Defendants would be able to produce evidence indirectly which could not be introduced directly. Such an outcome must be rejected.
 
 
 116
 On the basis of the foregoing, therefore, the Court concludes that the basic elements of a breach of contract case under Tennessee law must include (1) the existence of a contract, (2) breach of the contract, and (3) damages which flow from the breach. The plaintiff's performance under the contract is not an element of his claim, but rather an affirmative defense. Therefore, the district court's disposition of this issue must be affirmed.
 
 
 117
 G. Jury Instruction on Mitigation of Damages
 
 
 118
 The district court instructed the jury as follows:
 
 
 119
 The duty to mitigate does not require Life Care to sacrifice or surrender important and valuable rights, nor is Life Care required to comply with a wrongful demand by Charles Town in order to mitigate damages flowing from breach of contract.... Life Care was under no obligation to withdraw its solicitation in order to minimize or mitigate its damages, and you may not consider Life Care's refusal to withdraw its solicitation as a basis for reducing any damages to which you find Life Care is entitled.
 
 
 120
 It is patently clear that this jury instruction removes the issue of whether Life Care's solicitation was consistent with its fiduciary duties to Charles Town, including its general partners, from the jury. Moreover, it obviates the need for the jury to determine whether the Defendants' directive that Life Care cease its solicitation efforts was proper. These issues should have been decided by the jury and, thus, the jury instruction which has been challenged by the Defendants was erroneous.
 
 
 121
 Moreover, the jury instruction was deficient as to the respective burdens of mitigation that are imposed by Tennessee law. Under the laws of Tennessee, a non-breaching party has the duty to mitigate its damages. Cook & Nichols, Inc. v. Peat, Marwick, Mitchell & Co., 480 S.W.2d 542, 545 (Tenn.App.1971) ("One who is injured by the wrongful or negligent act of another, whether by tort or breach of contract, is bound to exercise reasonable care and diligence to avoid loss or to minimize or lessen the resulting damage, and to the extent that his damages are the result of his active and unreasonable enhancement thereof, or due to this failure to exercise such care and diligence, he cannot recover"). In the context of an agency relationship, the duty to mitigate obligates an agent to accept "a renewed offer of employment by the principal under reasonably satisfactory conditions not involving the surrender of his cause of action for the breach." RESTATEMENT (SECOND) OF AGENCY § 455, comment d; see also Sasser v. Averitt Express, Inc., 839 S.W.2d 422 (Tenn.App.1992) (when principal makes bona fide offer of reinstatement, agent seeking future damages has burden of demonstrating that reinstatement is not feasible). The issue of whether an agent has unreasonably failed to mitigate by refusing to accept a renewed offer of employment is an issue of fact for the jury. RESTATEMENT (SECOND) OF AGENCY § 455, comment d.
 
 
 122
 On the basis of the foregoing, the jury must be instructed that, even if Life Care's solicitation efforts were consistent with its fiduciary duties to Charles Town, Life Care had a duty to mitigate its damages. In accordance with this duty, Life Care had an obligation to accept the Defendants' conditional offer of continued employment,[15] if (1) the condition attached to the offer did not require it to surrender its rights under the contract or under the law and (2) renewed employment was otherwise feasible. See Lawrence v. Porter, 63 F. 62, 67 (6th Cir.1894) (conditional offer cannot rest on demand for "a waiver of the original contract, or of any right of action for its breach"); see also Sasser, 839 S.W.2d at 433 (agent need not accept conditional offer of reinstatement if principal "has demonstrated such extreme hostility that, as a practical matter, a productive and amicable working relationship would be impossible" or when the "employment relationship has been irreparably damaged by animosity").
 
 
 123
 Life Care did not have a right to solicit under its employment contract. Therefore, the Defendants' conditional offer of employment which required Life Care to cease the solicitation bid did not implicate a waiver of its rights under the contract. Moreover, even if a legal right and/or fiduciary obligation to solicit the limited partners did exist during all of the times that are relevant to this controversy, the Defendants' conditional offer of employment never obligated Life Care to relinquish its right to obtain an adjudication as to the propriety of the solicitation. Therefore, the record is clear that the Defendants' conditional offer was proper and lawful under the circumstances. Thus, Life Care had a duty to mitigate its damages by accepting the Defendants' offer even if it had a legal right and/or a fiduciary obligation to solicit the limited partners of Charles Town, unless it can demonstrate that the renewal of employment was not feasible. Id. (agent has burden of proving lack of feasibility). Accordingly, the jury must be so instructed.
 
 III.
 
 124
 Based on the foregoing, we affirm in part and reverse in part the district court's decision, and remand the case for a new trial in accordance with this opinion.
 
 
 125
 BATCHELDER, Circuit Judge, concurring in part and dissenting in part.
 
 
 126
 I would affirm the district court in all respects. Even if I could agree with the majority's apparent conclusion that in Tennessee, as a matter of law, an agent's fiduciary duty runs to the individual limited partners, I cannot agree with its conclusion that the conduct of the agent in this case, i.e., soliciting the votes of the individual limited partners, could constitute a breach of fiduciary duty. As the district court correctly pointed out, "Life Care simply solicited the proxies of the limited partners who were required to make the decision whether to retain the incumbent general managing partner, LPIMC. Life Care had no control over the vote and could not force the elimination of [the] incumbent general partner." The district court went on to hold that if Life Care owed a fiduciary duty at all, that duty was to the limited partnership and not to the individual limited partners. I am hard-pressed to see how, even if the duty were to the limited partners, the agent's mere solicitation of those individuals' proxies, without at least some demonstrated power on the part of the agent to force the individuals to comply with the solicitation, could constitute a breach of that duty.
 
 
 127
 Although the majority opinion appears to overrule the district court's "total rejection of the 'aggregate' theory of partnership and ... complete endorsement of the 'entity' theory," (pursuant to which the district court held that Life Care's duty, if any, was to the limited partnership), it does not clearly hold to whom Life Care owed a fiduciary duty. Rather, the majority opinion states, "while it is important to recognize that fiduciary duties flow to the individual partners of a limited partnership, it is also appropriate to subordinate those interests to those of the entity when a conflict of interest arises." The majority then holds that a genuine issue of fact remains as to whether Life Care's solicitation of proxies from the limited partners was warranted "notwithstanding its fiduciary duty to the general partners." (emphasis added).
 
 
 128
 Finally, the majority cites no authority (and I have found none) for its conclusion that Life Care's mere solicitation of proxies was a breach of its fiduciary duty unless Life Care could demonstrate the reasonableness of its basis for making the solicitation.
 
 
 129
 The district court's opinion is clear, its reasoning is cogent, and I would affirm.
 
 
 
 *
 Judge Batchelder would grant rehearing for the reasons stated in her dissent
 
 
 *
 The Honorable Julian Abele Cook, Jr., Chief United States District Judge for the Eastern District of Michigan, sitting by designation
 
 
 [1]
 For the purpose of subsequent discussion and evaluation of the issues, LPIMC, Charles Town and its general partners will be collectively identified as the Defendants
 
 
 [2]
 The only remaining issue at trial was Life Care's breach of contract/wrongful termination claim
 
 
 [3]
 Even though a general partner possesses an interest in retaining his position with the partnership, this viewpoint does not--standing alone--support the conclusion that his interests and the limited partnership are divergent. If the general partner is performing his assigned tasks in a satisfactory manner, the retention of the general partner may also be in the best interests of the limited partnership
 
 
 [4]
 The limited partners rejected Life Care's accusations and voted against the replacement of the general partners. While this may be probative of the inaccuracy of those accusations, it is not necessarily probative of whether Life Care reasonably believed those accusations to be true
 
 
 [5]
 Importantly, the district court, anticipating that its conclusions on fiduciary duty would be dispositive of that defense, did not decide if Life Care was an agent of the Defendants or whether there was a genuine issue of a material fact as to the existence of the agency. Rather, it appears that the district court assumed arguendo that Life Care was in fact an agent of the Defendants. Clearly, this is a threshold question (i.e., whether Life Care is an agent of the Defendants or merely an independent contractor) that should be addressed on remand
 It should be pointed out that the Defendants have submitted two additional arguments in opposition to the district court's conclusion that Life Care did not owe them a fiduciary duty. First, they have contended that Life Care should have been estopped from advancing its current position on the fiduciary duty issue because it had adopted the opposite view in the Colorado litigation. Second, they argued that, in striking their eighth affirmative defense pertaining to the breach of fiduciary duty issue, the district court improperly turned Life Care's motion to strike into a motion for summary judgment. They maintain that this decision by the district court wrongfully deprived them of an opportunity to demonstrate that a genuine issue of a material fact existed concerning the matter.
 In light of the conclusion by this Court that Life Care owed a fiduciary duty to the general partners, the issues of judicial estoppel and/or the procedural deficiencies, if any, are moot and, therefore, have not been addressed in this opinion.
 
 
 [6]
 The Defendants alleged that Life Care's proposal sought to (1) make operational changes that would have reduced the amount of revenues to be reimbursed by the Medicaid program, thereby decreasing the revenues to Charles Town; (2) turn the offices of the managing general partner and the managing agent into a single office, contrary to the underlying purpose of the management agreement which was designed to ensure the supervision of the managing agent by a third party; (3) expose Charles Town to a long-term, non-cancelable-upon-sale agreement, which would impact the marketability of Jeffersonian Manor; and (4) allow it to use its affiliates to provide services and receive profits at the financial detriment to Charles Town
 
 
 [7]
 The Defendants listed, among others, the following issues of law to be litigated:
 
 
 [4]
 Whether Life Care fully performed, and met all conditions precedent, under the terms of the Management Agreement
 ....
 
 
 [16]
 Whether Life Care's claims are barred by its breach of the Management Agreement and/or breach of fiduciary duty owe d to Charles Town Associates
 
 
 [8]
 Life Care's first set of interrogatories asked the Defendants to identify those portions of the management agreement upon which their claims of breach had been based. In response, the Defendants stated that Life Care had engaged in poor management, subjecting Jeffersonian Manor to exposure to unnecessary liability, excessive operating costs, and/or inability to market additional private pay census. In addition, the Defendants listed a litany of specific instances of mismanagement, including Life Care's failure to maintain adequate nurse staffing in the facility, as well as its use of physical restraints on patients without physician authorization, misuse of restraints, failure to document and/or report significant patient injuries, improper use of physical restrains on patients with pressure ulcers, improper infection control techniques used by the nursing staff, and failure to adequately meet nutritional requirements in accordance with physician prescribed diets
 
 
 [9]
 The Nashville Marketplace decision rested on estoppel grounds. 1990 WL 33373 at * 6, 1990 Tenn.App. LEXIS at * 15 ("Nashville Marketplace could have attempted to cure these problems ... had they been mentioned in the rejection notice. Since they were not, the First Capital defendants are estopped from relying on those reasons now")
 
 
 [10]
 Life Care sought treble damages on this count pursuant to TENN.CODE ANN. § 47-50-109 (1988)
 
 
 [11]
 This is not to suggest that an agent who acts outside of the scope of his agency, by acting on his own account and interest, can never bind the principal. The law is legion, in that a principal is bound to third parties by the acts of an agent who acts within his apparent or ostensible authority. Rural Educational Assoc. v. Bush, 42 Tenn.App. 34, 298 S.W.2d 761 (1956):
 Apparent authority in an agent is such authority as the principal knowingly permits the agent to assume or which he holds the agent out as possessing; such authority as he appears to have by reason of the actual authority which he has; such authority as a reasonably prudent man, using diligence and discretion, in view of the principal's conduct, would naturally suppose the agent to possess. Ostensible authority is such authority as a principal intentionally or by want of ordinary care causes or allows a third person to believe the agent to possess, and in some jurisdictions it is so defined by statute. Ostensible authority to act as agent may be conferred if the principal affirmatively or intentionally, or by lack of ordinary care, causes or allows third persons to act on an apparent agency.
 Id., 298 S.W.2d at 766 (quoting Southern Ry. Co. v. Pickle, 138 Tenn. 238, 197 S.W. 675, 677 (1917)).
 
 
 [12]
 Other jurisdictions have reached the opposite conclusion. See Home Savings of America, F.A. v. Inland Group, Inc., 1991 WL 270423, 1991 U.S. Dist. LEXIS 17948 (N.D.Ill. Dec. 3, 1991) (Illinois); Battista v. Lebanon Trotting Ass'n., 538 F.2d 111 (6th Cir.1976) (Ohio)
 
 
 [13]
 See supra note 12
 
 
 [14]
 The district court arrived at the same conclusion. May 12, 1994 Order at 5
 
 
 [15]
 Life Care claims that the Defendants never made a "post-breach offer" of continued employment. Life Care's formalistic argument must be rejected. It is evident that the Defendants advised Life Care that its services would be retained if the solicitation efforts ceased